STATE of Tennessee, Appellee,

v.

Terry Dwight BARBER, Appellant.

Supreme Court of Tennessee,
at Jackson.

March 21, 1988.
Rehearing Denied May 23, 1988.

W.J. Michael Cody, Atty. Gen. & Reporter, James W. Thompson, Asst. Atty. Gen., Nashville, for appellee.

John E. Vaughn, III, Mark L. Hayes, Tiptonville, for appellant.

## OPINION

DROWOTA, Justice.

The Defendant, Terry Dwight Barber, appeals directly to this Court his conviction of first degree murder and the sentence of death imposed by the jury. He raises numerous issues in this appeal, but, after careful review of the entire record and the law, we find these issues to be without merit. We, therefore, affirm the conviction and the sentence.

The victim, Lora Smith, age 75, lived alone in her home in Ridgely, Lake County, Tennessee. On the evening of February 3, 1986, she was robbed and murdered. The cause of death was multiple blows to the head and ensuing brain damage. There were at least five blows to the head, possibly more. All the blows to her head were struck while the victim was alive. The wounds were consistent with and could have been made with a crescent wrench.

On March 10, 1986, the Defendant, Terry Barber, and his brother, Ronnie Dale Bar-

ber, were indicted by the Lake County Grand Jury for first degree burglary, robbery by use of a deadly weapon, and first degree murder. On the same date, the State announced its intent to seek the death penalty as to Terry Barber. The Defendants' trials were severed. On July 19, 1986, Terry Barber was tried before a jury which returned a verdict of guilty to first degree burglary, robbery by use of a deadly weapon, and first degree murder in perpetration of larceny. He was sentenced to fifteen years, life imprisonment, and death by electrocution, respectively. The fifteen-year sentence was to be served concurrently with the life sentence.

At the sentencing hearing on the murder conviction the jury was charged and found two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, and (2) the murder was committed while the Defendant was engaged in committing larceny. T.C.A. § 39–2–203(i)(5) and (7) respectively. The trial judge charged two mitigating circumstances: (1) the youth of the Defendant at the time of the crime (T.C.A. § 39–2–203(j)(7)), and (2) the Defendant is a person capable of being rehabilitated. The jury found no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances, and returned their verdict as punishment of death.

## THE FACTS

The Defendant was 29 years old at the time of the murder, unmarried and resided with his parents, brother, Ronnie, sister, Teresa Dianne Lybarger, and brother-in-law, Steve Lybarger, in Lake County, not far from where the victim lived. On the night in question, the Defendant, his brother, sister and brother-in-law were playing cards at their home. Around 6:00 p.m. the Defendant and his brother Ronnie left in Ronnie's car and returned less than an hour later. Upon their return, the Defendant's sister heard the Defendant tell their mother that "he had to do it because she recognized him."

Defendant's brother-in-law, Steve Lybarger, testified that a few days before Christmas 1985 the Defendant asked him to participate in a burglary in Tennessee involving "an old woman and that he'd have to kill her because she'd recognize him." Lybarger responded that he "didn't want anything to do with it." The Defendant again tried to get Lybarger to join in the burglary plan during the last week in January or the first of February, and Lybarger declined a second time. Lybarger testified that on the evening of February 3, Ronnie and the Defendant left the house, were gone less than an hour, and returned around 7 p.m. The Defendant said: "Well, we did it." Later, the Defendant commented, "that the old lady was dead, that there was nothing to worry about." Lybarger asked the Defendant what he used and "he said a large crescent wrench ... she was hit in the head a few times." Lybarger described seeing a diamond ring when the Defendant had an encyclopedia and matched the diamond size to the diamond pictured in the encyclopedia. The ring had one large stone in the middle and one small stone on each side. Lybarger also observed a small plastic bag containing costume jewelry, a small caliber revolver, and two jewelry boxes, all of which he identified at trial. The Defendant then left alone to go uptown to make some phone calls. He told Lybarger "he was going to try and get rid of the stuff." Lybarger remembered the Defendant mentioning the name Bob. The Defendant told his mother that if anyone asked about his activities on that date, she was to say all he did was go to town to buy gas and cigarettes. On cross-examination, Lybarger admitted there was bad blood between him and the Defendant.

Steve Lybarger's testimony was similar to that of Wesley Dwight McClure, who was an inmate in the Lake County jail in February and March, 1986. McClure was in a cell adjacent to the Defendant for two weeks or a month. McClure testified that during the time that he was in the cell next to Barber, the Defendant related to him the details of the murder of Mrs. Smith. The Defendant explained that his brother, Ronnie, had previously worked for the victim on several occasions, and they didn't know if they would have to kill her when they were planning the burglary. On the evening of the robbery, Ronnie went to Mrs. Smith's front door, and Defendant went to the rear of the house and knocked out the back door window with a crescent wrench and gained entrance into the house. The Defendant was wearing a ski mask. Mrs. Smith recognized Ronnie and asked what was going on, and he told her it was a robbery. She started toward the telephone presumably to call the police and the Defendant grabbed her and hit her repeatedly on the top of her head with the crescent wrench. The Defendant told McClure that he "had to hit the old bitch four or five times to even get her down." The Defendant stated that a pistol, a ring, junk jewelry, and a couple of jewelry boxes were taken. The wrench was wrapped in a floor mat, and the Defendant threw it in the river from a bridge. That night he called a friend in Illinois named Bob to sell the ring. Bob came to Ridgely, picked up the Defendant and took him back to Illinois. The ring was sold for approximately a thousand dollars.

Bob McNeil, who lived in Illinois with Kathy King, testified for the State. He stated that on February 3, 1986, he received a telephone call from the Defendant. The Defendant told him he had some jewelry to show him. McNeil drove to Ridgely and got there about 1:00 a.m. on February 4, picked up Defendant and then drove back to Illinois. The Defendant had with him a couple of jewelry boxes, costume jewelry, a pistol, and a two and a half carat diamond ring with a small stone on each side, which he said had been taken in a burglary. On the morning of February 4, the Defendant and McNeil went to Indiana where the ring was sold for $1,200.00. McNeil received $150 and the Defendant got the balance. McNeil carried the Defendant back to Ridgely on February 5, and got there about 12:30 or 1:00 p.m. McNeil had buried the gun; however, he subsequently dug it up and gave it to a T.B.I. agent. McNeil testified that the Defendant

told him that he and Ronnie had committed a burglary, but McNeil knew nothing at any time about a murder.

Kathy King, who resided with Bob McNeil, testified that on February 3, she received a telephone call from the Defendant but McNeil was not there at the time. The Defendant called back and talked with McNeil, who left the house about 8:00 or 8:30 p.m. and was gone for six or seven hours. She stated that the Defendant came back to Illinois with McNeil in the early morning of February 4, and then they both left and were gone most of that day. McNeil drove the Defendant back to Tennessee on February 5.

Sue Poole, an employee of the Tennessee Development District, does house work for elderly people. She testified that on February 4, 1986, she went to the home of Mrs. Lora Smith and knocked on the door but there was no answer. She went to the rear of the house and noticed the door window had been broken. At approximately 12:30 or 1:00 p.m., she contacted the Ridgely Chief of Police, W.C. Robinson. Chief Robinson arrived at the scene, went into the house, and saw Mrs. Smith's body slumped over a chair in the livingroom, with blood on her head, the chair, and the floor. She was wearing house shoes and pajamas. The telephone was off the hook and on the floor.

The Defendant was arrested on February 5, 1986, and a search revealed that he had on his person two billfolds, $868.50 in cash, and some keys. One of the keys matched and had the same number, C127A, as a key found in Mrs. Smith's night stand; it fit a wooden sterilizer cabinet in her home. The other key was also identical to a key found in the night stand next to the victim's bed. At the time of his arrest, the Defendant's jacket had blood stains on it. The right front passenger's seat of Ronnie Barber's car also had a blood stain on it. In the search of the Barber home, an encyclopedia volume "D" was found, which contained a section on diamonds.

Willie Kimbell, an inmate in the Lake County Jail during February, 1986, testified that the Defendant gave him some letters to mail and some written messages to deliver to Defendant's brother, Ronnie, who was also in jail. Kimbell took the letters and messages to the Sheriff, who copied them, and then Kimbell would mail or deliver the originals. The Sheriff identified the letters and messages that were intercepted and copied by him, and read portions of them to the jury. A message obtained on February 11, from Defendant to his brother, Ronnie, stated in part: "The gray hairs and blood just means that car was used. Somebody else still could have done it besides us. Everything points to me." On February 17, Defendant again wrote a note to his brother in which he discussed the blood type of the victim and how the lab results might hurt him, he closed by instructing Ronnie to tell police: "We were looking at dogs in the encyclopedia instead of diamonds, remember? . . . That's why we had Volume "D" out. Ha. I don't know who snitched us out about that deal." On February 20, Defendant wrote his brother a lengthy note attempting to place the blame on Steve, his brother-in-law. On February 12, the Defendant wrote a letter to Bob (McNeil) in which he stated:

"I also need to know if I left them keys in that "J" box. I thought I threw them in the box before I left but I'm not sure. If not, then that's the only physical evidence they have on me. I just wish I knew for sure if they found them keys on me or not. I could swear I left them in the box but being up here for a couple of days gives me a loss of memory. That's the only thing that's got me connected directly with it. Without them keys, they wouldn't have much of a case. Even if I had them on me, it don't mean I killed anybody."

On the same date the Defendant wrote a letter addressed to Teresa Rogers, Alexandria, Tennessee, in which he stated: "I wish I could get someone down there to testify that I sold my car to them for $900.00." In a later letter to Ms. Rogers, the Defendant stated: "Ronnie's car was used and I fenced the stuff but I've got to explain where I got the $868.50 from they found on me."

A serologist with the T.B.I. lab in Nashville testified that human blood stains were found on Defendant's jacket and on a piece of material from Ronnie Barber's car. A T.B.I. agent who went to Illinois to talk with Bob McNeil testified that with McNeil's help he found the costume jewelry and a .22 caliber pistol. Another witness who was shown the .22 caliber pistol testified that he had previously owned the gun and had traded it to Mrs. Lora Smith in 1984.

Dr. Jerry Francisco, a pathologist from Memphis, testified for the State. He described the wounds to Mrs. Smith's head as multiple wounds to the head. The wounds to the back and left side of the head were associated with extensive skull fractures underlying the wounds. In the back of the head the skull was virtually crushed. The cause of death was multiple blows to the head with ensuing brain damage. There were at least five blows, possibly more. The wounds were consistent with and could have been made with a crescent wrench. She was alive when all the blows were struck because in all of the wounds an inflammatory reaction was present. Dr. Francisco further testified that there were bruises to the back part of both hands, these were fresh bruises. These bruises were the result of "blunt trauma" from whatever cause, which could be produced from a blow with a wrench. A photograph was introduced, by a T.B.I. agent who investigated the crime scene, showing the severely bruised condition of the victim's right hand. No photographs of the head wounds were shown to the jury.

The Defendant did not take the witness stand, and did not offer any proof in his defense in the guilt portion of the trial.

At the sentencing hearing the victim's son testified that his mother had been in bad health for four or five years, and that she had used a walker.

## I.

The Defendant first contends that the imposition of the death penalty, under the facts and circumstances of this case, is an unlawful disproportionate punishment. Defendant submits that his sentence of death violates the provisions of T.C.A. § 39-2-205(c)(4) as the sentence is excessive and disproportionate to the penalty imposed in similar cases.

T.C.A. § 39-2-205(c)(4) reads as follows: "(c) In reviewing the sentence of death for murder in the first degree, the Tennessee Supreme Court shall determine whether: ...

(4) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The Tennessee Supreme Court may promulgate rules as it deems appropriate to establish such procedures as are necessary to enable it to properly review the death sentence. (Public Acts 1977, ch. 51)."

On February 24, 1978,[1] this Court, pursuant to Chapter 51, Public Acts of 1977, promulgated Supreme Court Rule 47 (now Rule 12) requiring trial judges to complete and submit to this Court a "report of trial judge" in all first degree murder cases in which life imprisonment or a sentence of death is imposed. The nine page report was adopted to enable this Court properly to review whether the sentence of death was imposed in an arbitrary fashion and whether it was excessive or disproportionate to the penalty imposed in similar cases.[2] The report prepared by the trial judge consists of data concerning the defendant, the

---

1. On December 7, 1977, this Court adopted an "Interim and Proposed Rule 47." Approximately three months later, Rule 47 "for publication" was entered and became effective February 24, 1978. Rule 47 (now Rule 12) was adopted in an effort to comply with *Gregg v. Georgia*, 428 U.S. 153, 167, 96 S.Ct. 2909, 2922, 49 L.Ed.2d 859 (1976), and its progeny.

2. On January 28, 1981, this Court adopted new Rules of the Supreme Court and rescinded all previous Supreme Court rules. Rule 47 became Rule 12. On November 25, 1987, a new reporting form, consisting of twelve pages, was adopted by this Court to take effect January 1, 1988. See, *Rules of the Supreme Court*, Rule 12. The reports of the trial judges submitted under this rule may be found in the Clerk's office in Nashville.

trial, the victim, the aggravating and mitigating circumstances, the representation of the defendant, and other general considerations which we have found helpful in our review of first degree murder cases. The report is submitted to defense counsel and the attorney for the State, who may attach comments to the report. The trial judge is asked to comment on the appropriateness of the sentence. *See, State v. Morris*, 641 S.W.2d 883, 889 (Tenn. 1982). In the present case, Judge Joe Riley was of the opinion that the sentence imposed was consistent with the facts and the law which authorizes the death penalty.

■ In *State v. Groseclose*, 615 S.W.2d 142, 150 (Tenn.1981), and *State v. Coleman*, 619 S.W.2d 112, 115–116 (Tenn.1981), the efficacy of Rule 12 to afford a meaningful or realistic comparison of cases arising under the death penalty statutes was challenged. The defendants contended that the imposition of the death penalty was arbitrary and capricious. We held that the procedures prescribed in Rule 12 were sufficient and found the defendant's challenge to be without merit. *Accord, State v. Pritchett*, 621 S.W.2d 127, 141 (Tenn. 1981). In *State v. Strouth*, 620 S.W.2d 467, 470 (Tenn.1981), we found that Rule 12 provided adequate comparative review of sentences imposed on defendants found guilty of first degree murder. In *State v. Melson*, 638 S.W.2d 342, 367 (Tenn.1982), *cert. denied* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983), we held that the sentencing review process established under T.C.A. § 39–2–205 and Rule 12 of this Court are constitutionally adequate to afford a meaningful proportionality review.

■ Defendant asserts that a Lake County jury has never before returned a death sentence and that nothing in the facts of this case justify the Defendant's receiving the death penalty. We do not limit our proportionality review to a single county. We have reviewed Rule 12 reports from trial judges sitting throughout this State submitted over the past ten years in all criminal trials for first degree murder in which life imprisonment or a sentence of death have been imposed.

Defendant avers that this Court has generally affirmed only those death sentences which were for murders more "atrocious" than the one he is adjudged to have committed. He cites several unreported cases that he contends are more "atrocious" in which life sentences were given. Defendant cites *State v. Simon*, 635 S.W.2d 498 (Tenn.1982), as a murder far more "heinous, atrocious, or cruel" than the case at bar, in that Simon, in the course of a robbery, shot the victim in the neck, severing the jugular vein. She bled to death within a short time thereafter. We would agree that there are certainly cases in which we have affirmed death sentences for murders "more atrocious". *State v. Groseclose, supra*, is a good example. The victim was strangled into unconsciousness, then stabbed three or four times in the back near the spinal cord. Thinking the victim to be dead, her body was placed in the trunk of her automobile and the vehicle was driven to a parking lot in Memphis. During the trip, the defendant became aware that the victim was not dead for he heard her cries for help from the trunk. The victim was left locked in the trunk of her automobile in the broiling summer sun for several days. She died from the excessive heat in the trunk of her automobile.

There are reported cases in which a life sentence was given for murders that were also perhaps "more atrocious". In *State v. Wright*, 618 S.W.2d 310 (Tenn.Cr.App. 1981), the defendants Brock and Wright were convicted of murder in the first degree and each received a life sentence. The proof showed that the victim, the husband of Wright, died of multiple wounds to the head. The concurring opinion and the Rule 12 report of the trial judge indicate there were twenty-two blows to the head with a hatchet. In *State v. Turnbill*, 640 S.W.2d 40 (Tenn.Cr.App.1982), the defendant was convicted of murder in the first degree and received a sentence of life. The victim died from traumatic injuries to his head. The opinion and the Rule 12 report of the trial judge state that the defendant kicked the victim in the head and side and "stomped" him in the face repeatedly after

the victim was rendered helpless. The beating lasted for twenty-five to thirty minutes. In *State v. Kelley*, 683 S.W.2d 1 (Tenn.Cr.App.1984), the defendants William and Phillip Kelley were convicted on three counts of first degree murder and one count of assault with intent to commit murder. They were sentenced to three terms of life on the murder convictions, to be served consecutively. The evidence showed that several members of the Estis family were fishing on a sandbar in the Duck River in Maury County. Without warning and without provocation or explanation from either defendant, a senseless slaughter ensued. The defendants fired at six adults and four children from the bluff above the river, killing three adults and injuring one. Each victim was shot at least twice, one victim was shot a third time at close range. The Rule 12 report of the trial judge stated that while capital punishment was justified, life sentences were not legally inappropriate. In deciding whether to impose the death penalty in this senseless assault on the Estis family, the jury, as in all death penalty cases, was called upon to weigh the statutory aggravating circumstances and the mitigating circumstances. T.C.A. § 39-2-203. William Kelley was 21 years old on the day of the offense and Phillip was 19. The trial judge's report stated that the youth and immaturity of Phillip, possible drug use, and his cooperation with officers in confessing and locating the evidence, were significant facts concerning mitigating circumstances that influenced the punishment imposed. Similar mitigating facts were found in William Kelley's case. Neither defendant had any significant history of prior criminal activity. Although two aggravating circumstances were charged, the jury found none, and thus life sentences were imposed on the defendants.

The above first degree murder cases point out the many variables involved. No two cases are alike, and no two defendants are alike. A comparative review does help us make the determination of whether the penalty imposed in the case at bar is or is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. *See Lockett v. Ohio*, 438 U.S. 586, 602–605, 98 S.Ct. 2954, 2963–2965, 57 L.Ed.2d 973 (1978) (an individualized sentencing decision is essential in capital cases). *Cf. State v. Moss*, 727 S.W.2d 229 (Tenn.1987) (sentences under the Sentencing Reform Act of 1982 depend on the nature of the crime and the criminal).

The Defendant points out that from 1909–1960, there were 134 executions in Tennessee and that the last execution in this state took place on November 7, 1960, that of William Tines.[3] Defendant avers that since there have been no executions during the past twenty seven (27) years, it must indicate some ambivalence towards the death penalty. What Defendant fails to consider is that our prior death penalty statutes were declared unconstitutional and the first decision of this Court which approved the imposition of the death penalty under the present statute, Chapter 51, Public Acts of 1977, was *Houston v. State*, 593 S.W.2d 267 (Tenn.1980), *cert. denied*, 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980), rehearing denied 449 U.S. 1067, 101 S.Ct. 797, 66 L.Ed.2d 612 (1980). In 1979, our present death penalty was held constitutional in *Miller v. State*, 584 S.W.2d 758 (Tenn.1979), and *Cozzolino v. State*, 584 S.W.2d 765 (Tenn.1979). Since 1980, the death penalty has been imposed, beginning with *Houston*, in sixty-five cases.

Our 1977 statute, unlike those in California and Texas, created a comparative proportionality review to serve as an additional safeguard against arbitrary or capricious sentencing.[4] Such review of death cases ensures rationality and consistency in the

---

3. Our research discloses that the first execution by electrocution occurred on September 13, 1916. Since that time, 124 persons have been electrocuted in the electric chair in the State of Tennessee.

4. Comparative proportionality review of a death sentence by an appellate court is not constitutionally required in every case in which the death penalty is imposed and the defendant requests it. *Pulley v. Harris*, 465 U.S. 37, 50, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984).

imposition of the death penalty. However, we must remember that "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant v. Stephens*, 462 U.S. 862, 884, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983).

A comparative review, with the aid of the Rule 12 report of the trial judge, has been conducted in all first degree murder cases in which life imprisonment or a sentence of death has been imposed. The following cases in which the death penalty has been imposed have many striking similarities with *Barber*. In *State v. McNish*, 727 S.W.2d 490 (Tenn.1987), the victim, Gladys Smith, like Lora Smith, lived alone. She was a 70 year old widow, frail, weighing less than one hundred pounds, but still capable of living on her own. Like Lora Smith and Terry Barber, there was a great disparity in the physical strength and ability between Gladys Smith and David McNish. Gladys Smith was beaten about the head and face with a glass flower vase that belonged to her. The vase itself was shattered by the blows, and the victim's skull was fractured in several places. The numerous crushing blows inflicted upon the victim were sufficient to show that the murder was "especially heinous, atrocious, or cruel". T.C.A. § 39–2–203(i)(5). This was the only aggravating circumstance that the jury found to have been established. The infliction of repeated blows to the head was sufficient evidence of premeditation. There was evidence that McNish was short of funds, and his own testimony confirmed that of several other witnesses that he had planned to go to Mrs. Smith's apartment in an effort to obtain some money from her. The State relied upon the aggravating circumstance of felony murder, T.C.A. § 39–2–203(i)(7), but the jury did not find that the murder was committed while defendant was attempting to commit robbery. Thus, in *McNish*, the jury found only one aggravating circumstance, and no mitigating circumstance was established sufficient to outweigh the aggravating circumstance and McNish was sentenced to death.

In *State v. Harbison*, 704 S.W.2d 314 (Tenn.1986), the defendant Harbison, like McNish and Barber, was a casual acquaintance of the victim. As in *McNish*, the defendant Harbison brought no weapon with him to the scene of the crime, but grabbed a marble vase when he saw her reach for her pocketbook. Harbison, thinking that the 62 year old victim was reaching for a gun, grabbed her and they began "tusslin". He hit her with the vase, knocking her down. He stated that he struck her with the vase "at the most" two times. The medical examiner testified that in his opinion she was struck at least three times. The cause of death was massive multiple skull fractures. As in *McNish*, unpleasant and gruesome photographs were introduced, which demonstrated repeated blows to the head of the victim. The State relied on a single aggravating circumstance—that the murder was committed while the defendant was engaged in committing a burglary. T.C.A. § 39–2–203(i)(7). The jury found the evidence supported this aggravating circumstance and that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance and Harbison was sentenced to death.

In *State v. Campbell*, 664 S.W.2d 281 (Tenn.1984), a 72 year old resident of a retirement home was found severely beaten about the head with a blunt object. Two fingers on his left hand were crushed and maimed, indicating he had tried to ward off the blows. The autopsy showed at least eight blows to the head of such severity that his skull was fractured and he had a hemorrhage of the brain. While the evidence against Campbell was circumstantial, it was sufficient for the jury to find, beyond a reasonable doubt, that he killed the victim in the course of a robbery, which is murder in the first degree. T.C.A. § 39–2–203(i)(7). In addition, the jury found "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind", T.C.A. § 39–2–203(i)(5), and that the defendant had been "previously convicted of one or more felonies other than the present charge which involved the use or threat of

violence to the person", T.C.A. § 39–2–203(i)(2).

Two members of this Court felt the sentence of death was imposed in an arbitrary fashion in *State v. Johnson*, 698 S.W.2d 631 (Tenn.1985), *cert. denied* 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 679 (1986). In a three to two decision, Johnson's conviction of first degree murder and sentence of death was affirmed. The victim was an 84 year old man who lived alone. Johnson went to the victim's residence to demand the return of firearms which he had earlier pawned or sold to him. The victim refused and resisted the defendant's demand and Johnson proceeded forcibly to take the rifles from the victim. In so doing, Johnson struck the victim in the head with a glass candlestick, knocking him unconscious and fatally injuring him. As in *McNish* and *Harbison*, Johnson brought no weapon with him to the victim's residence, but grabbed a candlestick belonging to the victim. The evidence indicated that the defendant struck the victim at least twice in the head, causing at least two fractures of his skull. The defendant took the two guns in question as well as three others and more than $100.00 which the decedent had on his person. The jury found two aggravating circumstances, T.C.A. § 39–2–203(i)(2) and (7) in that (1) the defendant had been previously convicted of second degree murder in 1975 and (2) that the defendant killed the decedent while robbing him. The jury further found no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances and Johnson was sentenced to death. Two members of this Court dissented, and stated they would set aside the death sentence and impose a life sentence upon Johnson. The dissenters stated: "Considering all of the circumstances of this crime, especially the indications that the decision to kill was made on 'the spur of the moment', and mindful of the injunction laid down by the Supreme Court in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759 at 1764, 64 L.Ed.2d 398 (1980), that 'a capital sentencing scheme must, in short, provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not," ' we would exercise the authority vested in this Court by T.C.A., Section 39–2–205(c)(1)," which Section states: "(c) In reviewing the sentence of death for murder in the first degree, the Tennessee Supreme Court shall determine whether: (1) The sentence of death was imposed in any arbitrary fashion".

In *State v. Cone*, 665 S.W.2d 87 (Tenn. 1984), the defendant was found guilty of felony-murder in the perpetration of burglary. Cone entered the home of Mr Todd, 93 years of age, and his wife, 79 years of age, by breaking a latch on the rear door. The elderly couple were repeatedly beaten about the head with a blunt instrument. Defensive wounds appeared on the arms and hands of both victims.

In *State v. Melson, supra*, Melson, a farm foreman, was found guilty of murdering the owner's wife. A blunt instrument, probably a hammer or crescent wrench, was used to crush the victim's skull. The official cause of death was multiple blunt trauma to the head and neck. There were also trauma to her arms and a broken finger, which were consistent with defensive injuries which one would sustain while fending off blows. The trial judge's report stated that it appeared the victim suffered several blows before her death or unconsciousness occurred, and "[t]herefore, I believe the death sentence imposed by the jury in this case is appropriate."

As stated earlier, the above six cases have many similarities with *Barber*. In all six cases the victims were repeatedly beaten about the head with a blunt instrument causing their death. All six defendants inflicted repeated and vicious blows to the helpless victims without any provocation, as in the case at bar. In five of the six cases, the victims knew the defendant, as in this case. Six of the victims were elderly, three lived alone and were killed in their home (*McNish*, *Harbison* and *Johnson*), as was the victim in the case at bar. There was disparity in the physical strength between all the victims and all six defendants, as in the case at bar. In three of the cases, *Campbell*, *Cone* and *Melson*,

defensive wounds appeared on the back of the victims' hands, as in the case at bar. In four of the six cases, the jury found "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." T.C.A. § 39–2–203(i)(5) (*McNish, Campbell, Cone* and *Melson*). In four of the cases, the jury found "the murder was committed while the defendant was engaged in committing robbery, burglary or larceny." T.C.A. § 39–2–203(i)(7) (*Harbison, Campbell, Johnson* and *Cone*).

■ Barber, much like the defendants described above, showed a total disregard for human life in the fierceness and atrocity of the attack, the number of blows inflicted, and the absence of any provocation by a defenseless victim. The 75 year old victim had been in bad health and used a walker. Barber's brother-in-law testified that the Defendant asked him to participate in a burglary involving "an old woman and that he'd have to kill her because she'd recognize him." The Defendant was wearing a ski mask but the victim recognized the Defendant's brother, Ronnie. After the murder, the Defendant stated "he had to do it because she recognized him." The Defendant told McClure that he "had to hit the old bitch four or five times to ever get her down." The victim's skull was virtually crushed and there were at least five blows, possibly more. She was alive when all the blows were struck. In making a comparative review and considering the nature of the crime and the defendant, we are of the opinion that the imposition of the death penalty by the jury was neither arbitrary nor excessive or disproportionate to the penalty imposed for similar crimes.[5]

## II.

The Defendant next avers that the evidence did not support the jury's findings of statutory aggravating circumstances, nor did the evidence support the jury's findings of the absence of any mitigating circum-

stances sufficiently substantial to outweigh the aggravating circumstances.

## A.

■ As discussed earlier in this opinion, the jury found two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, and (2) the murder was committed while the Defendant was engaged in committing larceny. T.C.A. § 39–2–203(i)(5) and (7). The evidence is clear and the Defendant concedes that the second aggravating circumstance, that the Defendant murdered the victim while engaged in committing larceny, was sufficiently established. The victim's 2½ carat diamond ring, which later sold for $1,200.00, a pistol, costume jewelry and two jewelry boxes were taken from the victim. As for the first aggravating circumstance, the jury considers the evidence raised in both the guilt and sentencing hearing. T.C.A. § 39–2–203(e). In *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), we said that:

"to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer. 'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

690 S.W.2d at 529.

The evidence in the guilt phase showed that the cause of death was multiple blows to the head and ensuing brain damage. In the back of the head, the skull was virtually crushed. There were at least five blows, possibly more. The victim was alive when all the blows were struck because in all of the wounds an inflammatory reaction was

---

**5.** A comparative proportionality review is conducted by this Court in all death penalty cases; however, in the case at bar we have dealt with this issue in more detail and at greater length because this was the one issue most seriously pursued by the Defendant on appeal.

present. Dr. Francisco could not be precise in stating how long the victim was conscious while the blows were struck or how long she lived after the blows were struck. However, the jury could permissibly infer that the victim was conscious while standing and receiving the repeated blows based on the Defendant's statement to another prisoner in jail that "I had to hit the old bitch four or five times to ever get her down." Other evidence of the victim's consciousness would be the fact that fresh bruises to the back part of both hands were found and a photograph introduced showing the injury to the hands. These bruises were the result of "blunt trauma". These defensive wounds, similar to those found in *Campbell, Cone* and *Melson,* more than likely were caused when the victim attempted to ward off the blows to her head. In *Melson, supra,* 638 S.W.2d at 367, we stated that the "proof shows that Mrs. Lawrence had defensive injuries to her arms and hands, proving that there was time for her to realize what was happening, to feel fear, and to try to protect herself." We are of the opinion that the evidence is sufficient to support the jury's finding of both aggravating circumstances.

### B.

■ The Defendant contends that the evidence does not support the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances. The jury was charged to consider "the youth of the defendant at the time of the crime", T.C.A. § 39–2–203(j)(7) and that "the defendant is a person capable of being rehabilitated". There was evidence in the record dealing with both mitigating circumstances. Barber was 29 years old at the time of the offense. In three cases discussed earlier in which the death penalty was imposed, Campbell was 24, Harbison was 27, and McNish was 29. The weight given aggravating and mitigating circumstances is entirely within the province of the jury. The jury determines whether or not mitigation exists and whether it outweighs the aggravating circumstances. *State v. Melson, supra.* We are of the

opinion that the evidence is sufficient to support the jury's finding that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances so found. T.C.A. § 39–2–203(g).

### III

The Defendant next argues that the Death Penalty Act is unconstitutional, alleging that it is vague, overbroad, internally contradictory, and forecloses the possibility of mercy on the part of the jury.

■ Defendant argues that it is impossible to tell from T.C.A. § 39–2–203 "the correct analysis" in arriving at a death sentence. The statute in pertinent part provides:

If the jury unanimously determined that no statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, or if the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proved by the state beyond a reasonable doubt but that said circumstance or circumstances are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment.

\* \* \* \* \* \*

If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death.

T.C.A. § 39–2–203(f) and (g). These provisions clearly state the correct analysis in arriving at a death sentence. The sentencing procedure under the death penalty statute is constitutional. *See Houston v. State, supra; Cozzolino v. State, supra;* and *State v. Dicks,* 615 S.W.2d 126, 131 (Tenn.1981).

The Defendant also argues that his due process rights are being violated because the Act does not designate who has the burden of proof as to aggravating and mitigating circumstances. The statute, cited

above, clearly provides that the burden of proof is on the State to prove beyond a reasonable doubt the existence of any statutory aggravating circumstance. T.C.A. § 39–2–203(f)(g). This argument has been previously addressed in *State v. Johnson,* 632 S.W.2d 542 (Tenn.1982); *State v. Coleman, supra; State v. Pritchett, supra; State v. Dicks, supra;* and *State v. Melson, supra.*

Finally, the Defendant attacks T.C.A. § 39–2–203(i)(5) as being unconstitutionally vague and overbroad. He avers the words "heinous, atrocious, and cruel" can take myriad meanings. This argument has been repeatedly rejected. *State v. Williams, supra; State v. Melson, supra; State v. Pritchett, supra; State v. Strouth, supra; State v. Groseclose, supra;* and *State v. Dicks, supra.*

### IV

■ The Defendant contends that the trial court erred in sentencing the Defendant to death by electrocution [6] in that such punishment constitutes cruel and unusual punishment under the U.S. Constitution and the Tennessee Constitution. The issue of whether or not the death penalty constitutes cruel and unusual punishment is, in the last analysis, a moral question which has been resolved in this State by our Legislature as the representatives of the people. This Court has repeatedly held that this state is not prohibited from imposing the death penalty in the manner set forth in T.C.A. § 39–2–202, *et seq.,* by the restrictions placed on it by the Eighth and Fourteenth amendments of the United States Constitution, and by Article I, Sections Nine and Sixteen of the Tennessee Constitution. *See Miller v. State, supra; Cozzolino v. State, supra; Houston v. State, supra;* and *State v. Williams, supra.*

In *State v. Caldwell,* 671 S.W.2d 459, 466 (Tenn.1984), we stated:

Defendant concludes by arguing that the death penalty is cruel and unusual; the death penalty lacks penological justifica-

tion; and death by electrocution is cruel and unusual punishment since it involves torture and prolonged suffering. This Court has rejected similar arguments in past cases. *See State v. Melson,* 638 S.W.2d 342 (Tenn.1982), *cert denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1984); *State v. Austin,* 618 S.W.2d 738 (Tenn.1981), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); see also *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

Recently in *State v. Adkins,* 725 S.W.2d 660 (Tenn.1987), this Court responded to a similar argument by stating:

Defendant contends that the Tennessee Death Penalty Statute is unconstitutional as cruel and unusual punishment. We rejected that contention in *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981), and a number of later cases. Defendant also says that the use of electrocution, when there are more humane forms of legal killing, such as lethal injection, violates the constitutional prohibition against cruel and unusual punishment. The validity and humanity of that complaint should be addressed to the Legislature. This Court's authority over punishment for crime ends with the adjudication of constitutionality.

### V

■ The Defendant next argues that the trial court erred in not responding to the jury's inquiry regarding a non-unanimous sentencing by the jury during the sentencing phase. Defendant challenges T.C.A. § 39–2–203(h) as being prejudicial to him and likely to interfere with a fair and impartial jury deliberation.

T.C.A. § 39–2–203(h) states:

If the jury cannot ultimately agree as to punishment, the judge shall dismiss the jury and the judge shall impose a sentence of life imprisonment. The judge shall not instruct the jury, nor shall the attorneys be permitted to comment at

---

**6.** The method of execution was changed from hanging to electrocution by the Public Acts of 1913, Ch. 36. *See* T.C.A. § 40–23–114.

any time to the jury, on the effect of the jury's failure to agree on a punishment. We have held that it is constitutional under the above statute not to inform the jury that if they fail to agree unanimously on punishment, the trial court will impose a life sentence. *State v. Melson, supra; State v. Simon,* 635 S.W.2d 498, 505 (Tenn. 1982), *cert denied* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982); *State v. Harrington,* 627 S.W.2d 345 (Tenn.1981); *State v. Pritchett, supra; State v. Strouth, supra;* and *Houston v. State, supra.*

## VI

■ The Defendant next avers that the trial court erred in severing his trial and that of his brother, Ronnie Barber. A motion to sever is addressed to the sound discretion of the trial judge, and his exercise of such discretion will not be reversed unless it appears that the defendant was prejudiced. *State v. Coleman, supra; State v. Coker,* 746 S.W.2d 167 (Tenn.1988). There has been no showing that the Defendant was prejudiced by the trial court granting a severance. The State requested a severance in order to be lawfully able to introduce a statement by Ronnie Barber into evidence which could not be redacted without substantially altering its meaning. This is clearly a proper ground for severance. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

## VII

The Defendant argues that the felony murder statute, T.C.A. § 39-2-202, is unconstitutional in two respects. First, it violates the due process clause of the Fifth Amendment to the U.S. Constitution, by elevating what might have been an accidental killing, or one in self-defense, or a lesser degree of homicide to first degree murder, with a possible death sentence, if committed during one of the listed felonies. Secondly, it puts the defendant in double jeopardy, since he can be tried twice, in essence, for the same felony.

In response to the due process argument, in *State v. Hooper,* 695 S.W.2d 530 (Tenn.

Crim.App.1985), the Court of Criminal Appeals stated:

> The Legislature may declare an act or conduct to be criminal without regard to the actor's intent. *McKnight v. State,* 171 Tenn. 574, 106 S.W.2d 556 (1937); *Hunter v. State,* 158 Tenn. 63, 12 S.W.2d 361 (1928). The statutory form of murder in the first degree while in the perpetration of a felony is a valid and constitutional exercise of the legislative function.

*Id.* at 535; *see also State v. Norris,* 684 S.W.2d 650, 652–653 (Tenn.Crim.App.1948).

■ In *State v. Blackburn,* 694 S.W.2d 934 (Tenn.1985), this Court held the imposition in a single trial of dual convictions for both felony murder and the underlying felony does not violate the constitutional prohibitions against double jeopardy. Defendant's argument that the felony murder statute is unconstitutional because it violates due process and double jeopardy is without merit.

Counsel for Defendant has advanced several additional issues, all of which we have carefully considered but do not find sufficient to warrant a reversal of the conviction or the sentence. In accordance with the mandate of T.C.A. § 39-2-205, we find: that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports the jury's findings of two statutory aggravating circumstances; that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found; and our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The sentence of death will be carried out as provided by law on the 30th day of June, 1988, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

HARBISON, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.

## ORDER

A petition for rehearing has been filed on behalf of Appellant. After consideration of the same, the Court is of the opinion that the petition should be and the same hereby is overruled at the cost of Appellant.

HARBISON, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.