**STATE of Tennessee, Appellee,**

v.

**Nicholas Todd SUTTON, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Oct. 24, 1988.

Petition to Rehear Denied Dec. 5, 1988.

John E. Appman, Jamestown, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Gordon W. Smith, Asst. Atty. Gen., Nashville, Charles E. Hawk, Dist. Atty. Gen., Frank A. Harvey, Asst. Dist. Atty. Gen., Kingston, D. Roger Delp, Asst. Dist. Atty. Gen., Loudon, for appellee.

## OPINION

DROWOTA, Justice.

The defendant, Nicholas Todd Sutton, appeals directly to this Court his conviction of first degree murder[1] and the sentence of death imposed by the jury. He presents four primary issues for our review: (1) whether the evidence was sufficient to support his conviction and sentence; (2) whether the statutes upon which the verdict is based are unconstitutional under the state and federal constitutions; (3) whether he was denied the right to a fair trial; and (4) whether the trial court erred in its ruling on the admissibility or exclusion of evidence. After a careful review of the entire record and the law, we find these issues to be without merit. We, therefore, affirm the conviction and the sentence.

The defendant Sutton was jointly indicted and tried with co-defendants Charles Freeman and Thomas Street for the murder of Carl Estep at the Morgan County Regional Correctional Facility on January 15, 1985. All four men were inmates at that facility on the day of the murder. Freeman was acquitted by the jury. Street was convicted of first-degree murder and sentenced to life imprisonment. Sutton was convicted of first-degree murder and sentenced to death upon the jury's finding of three aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) the murder was committed by the defendant while he was in lawful custody or in a place of lawful confinement or during his escape from lawful custody or from a place of lawful confinement. T.C.A. § 39–2–203(i)(2), (5) and (8). The jury found no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances.

### I

#### Sufficiency of the Evidence

■ Defendant first argues that the evidence was insufficient to support his conviction of first degree murder and his sentence of death. It should be remembered that all conflicts in the testimony must be resolved in favor of the State. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). Where the sufficiency of the convicting evi-

1. T.C.A. § 39–2–205(a).

dence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); TRAP 13(e).

The defendant Sutton and co-defendants Freeman and Street were residents of Guild 6 at the Morgan County Regional Correctional Facility on the day of the murder. The victim, Carl Estep, was a resident of Guild 5, which was located next to Guild 6. The facility is composed of one story buildings, guilds, which are equivalent to dormitories. Each guild has approximately 30 cells located along the outer walls. These cells are approximately 5′ × 10′ and have a wooden door with a vertical window. The cells contain a bunk bed for two inmates and have a toilet and sink. In the center of the guild is the correctional officer's station which is totally enclosed with glass. Also in the center of the guild are tables and benches and open space for the inmates, referred to as the dayroom area. The correctional officer, from his station in the center of the building, can observe the cells of the inmates. On January 15, 1985, when Carl Estep was murdered, there was no correctional officer in Guild 5 between 9:30 and 10:00 a.m. During a routine "shakedown" after 10:00 a.m. correctional officers found the body of Estep lying on the lower bunk of his cell in Guild 5. There were signs of a struggle and blood was observed on the wall, the bed covers and on Estep's body. Attempts made to revive Estep proved unsuccessful. The entire facility was then "locked down," and all inmates in Guild 5 were interviewed.

Estep, who had been serving a sentence for child molesting, had been stabbed thirty-eight times in the chest and neck. Most of the wounds were superficial, but nine were potentially fatal, having penetrated Estep's lungs, his vena cava and carotid artery. The examining pathologist testified that this latter wound would have caused death in a matter of minutes. There were seven defensive wounds on Estep's hands and right arm and a wound to the back of his head caused by a blow. It was the opinion of the pathologist that from the size of the wounds two knives had been used by Estep's attackers. On the bottom bunk investigating officers found two homemade knives, called "stickers" in prison jargon, which matched the wounds on Estep's body. A later investigation of the cell uncovered a third knife hidden under a lamp beside Estep's bed.

The testimony of four inmates, sometimes contradictory and evasive, linked the defendant Sutton to the murder. The first to testify was Harold Meadows, a resident of Guild 5. He testified that he was sitting in the dayroom area when he saw Sutton and Street enter the guild and go straight to Estep's cell. He stated that each day between 9:30 a.m. and shortly after 10:00 a.m. there was a period of five to ten minutes when no guards were in Guild 5 due to a duty change. It was during this time on January 15, that he observed Sutton and Street enter the guild. When they entered Estep's cell, his roommate immediately came out and shortly thereafter the volume of the tv or radio increased, and Meadows heard a scream, and Sutton and Street came out. When questioned by correctional officers immediately after the incident, he told them what he had seen and identified Sutton and Street from a photographic line-up. Meadows further testified that on Sunday, January 13, he had seen Estep having a "physical discussion" with Sutton and Street, during which Sutton held a knife to Estep's throat.

Another resident of Guild 5, Estel Green, testified that he was standing in front of the door to his cell (# 1), right next to Estep's cell (# 2), when he saw Sutton and another inmate go inside Estep's cell. Green then went into his cell. When he came back out, he saw the other men in the guild moving toward the back away from Estep's cell. Green moved away with them and heard Estep "holler out. He said, 'Don't do that; please don't do that.' and then he hollered louder, he hollered, 'Somebody help me; somebody please help me.'

and that was all I heard." Green was not able to see who left Estep's cell.

Ralph Edward Scates was a resident of Guild 3, but he worked as a laundry man in Guild 1. Scates testified that he had a casual conversation with Street while Street was confined to Guild 1 for investigative purposes after the killing. Street admitted to Scates that "he [Street] cut him ... he stuck him, cut his throat." Street said that homemade knives had been used and that he had tried to flush his down the commode in his cell in Guild 6. Scates stated that Sutton had told him, "The SB got exactly what he deserved."

The last inmate to testify for the State was Cary Scoggins. He testified that Estep was a marijuana dealer at the facility and had sold defendants some "bad merchandise" and had refused to refund the defendants' money. He testified that after the defendants took Estep's watch and some other articles, Estep had threatened to kill Sutton. Scoggins, a resident of Guild 6, happened to be in Guild 5 on the morning of January 15 between 9:30 a.m. and 10:30 a.m. He stated that he saw Sutton, Street and Freeman come into the guild and enter Cell 2, Estep's cell. He looked through the window in the door of Estep's cell, a vertical window four inches by thirteen inches and saw all three defendants standing in front of the bunk bed with their backs to the window. He saw Estep try to get up from the bottom bunk and Sutton and Freeman pulled knives. Sutton started to stab Estep, who screamed. Scoggins stated that Sutton "just kept on stabbing" about sixteen times. The three defendants then washed their hands in the sink. Scoggins then moved away from the door and left the guild before the defendants did.

In order to contradict Scoggins' testimony, the defendant Freeman presented the testimony of Gary Lumbert, Scoggins' cellmate. Lumbert testified that Scoggins was working with him in the prison library at the time Estep was murdered.

The State recalled James Worthington, the administrative assistant to the warden at the time of the killing, and he testified that he had investigated the murder. He stated that Lumbert had told him that he was present in Guild 6 immediately after Estep had been killed, and that he observed Sutton and Street enter the guild, remove their clothes, and place their clothes in the laundry. Lumbert also told Worthington that Sutton bragged "about stabbing Carl Estep twenty-some times."

On January 15, two garbage bags found outside Guild 8 were brought to Worthington, one containing trash and the other prison clothing. A telephone pass for defendant Freeman was found in one pair of the pants. F.B.I. analysis of the debris from the clothing in the garbage bag revealed a hair consistent with that of the victim on a pair of button-fly jeans and a hair consistent with that of Charles Freeman on one of the jackets. A forensic serologist employed by the T.B.I. testified that she was able to identify a human blood stain matching the victim's blood type on the sleeve of one of the jackets, one of the knives and a work shirt. She also found human blood on one of the jackets, a pair of zipper-fly blue jeans and an elastic bandage. Tests were inconclusive as to whether human blood was on the other knife.

■ The defendant Sutton in support of his first issue, that the evidence does not support the verdict, states that "[t]he principal question raised is not as to the quantity of the evidence, but rather as to the quality." As an example, he attacks the testimony of Scoggins and argues that it would have been physically impossible for him to have seen the attack through the window of Estep's cell. The photograph of the cell door, which was introduced through the testimony of James Worthington, does not indisputably establish that it would have been impossible for Scoggins to have seen the attack on Estep. While the four inmates may not have been ideal witnesses, any inconsistencies or contradictions in their testimony were not so great that their testimony must be discounted as a matter of law. It was for the jury to judge the credibility of the witnesses and reconcile any conflicts in their testimony. *Wofford v. State*, 210 Tenn. 267, 358 S.W.

2d 302, 305 (1962). As stated earlier, the principles which govern our review of a conviction by a jury are well settled. A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978); *State v. Townsend,* 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832 (Tenn. 1978). After viewing the evidence in the light most favorable to the State, we must affirm the conviction if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); TRAP 13(e). Based upon the testimony of Meadows, Green, Scates and Scoggins, we have no hesitancy in holding that the evidence against Sutton was sufficient to support the first degree murder conviction beyond a reasonable doubt.

The evidence was also sufficient to sustain the jury's verdict as to the sentence. In reviewing the sentence of death, we must determine whether the sentence was imposed in an arbitrary fashion, whether the evidence supports the jury's findings of statutory aggravating circumstances, whether the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances found, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. T.C.A. § 39–2–205(c)(1–4). The record before us clearly demonstrates that the death sentence was not imposed in an arbitrary fashion. The sentencing hearing comported in all respects with T.C.A. § 39–2–203.

■ The evidence also supports the jury's finding of three aggravating circumstances: (1) prior conviction of a violent felony; (2) murder heinous, atrocious or cruel; and (3) murder committed while defendant in a place of lawful confinement. T.C.A. § 39–2–203(i)(2), (5) and (8). First, the defendant had previously been convicted of felony first-degree murder,[2] a crime involving the use of violence to the person. Secondly, the defendant at the time of Estep's murder was incarcerated and serving a sentence for the prior first-degree murder, and was thus in lawful custody or in a place of lawful confinement. Thirdly, the multiple wounds (38), the method and motive for the killing, all support the aggravating circumstance that the murder was especially heinous, atrocious or cruel. The autopsy revealed seven defensive wounds, indicating that Estep fought his attackers and was injured during the fatal attack. The victim was screaming and pleading for help during his attack. This evidence supports the jury's finding of the third aggravating circumstance.

The evidence also supports the jury's finding that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances.

■ Defendant finally argues that the sentence was excessive and disproportionate to the penalty imposed in similar cases. He argues that "[t]his is the first time in the modern era that the death penalty has been imposed for prison murder." Defendant points out that the State's proof in regard to the actual events surrounding the death of Estep consisted of only inmate testimony. As stated earlier, it was for the jury to judge the credibility of the witnesses and to reconcile any conflicts in their testimony. *Wofford v. State,* 210 Tenn. 267, 358 S.W.2d 302, 305 (1962). As we discussed in the recent case of *State v. Barber,* 753 S.W.2d 659 (Tenn.1988), no two cases are alike, and no two defendants are alike. A comparative review of first degree murder cases does help us make the determination of whether the penalty imposed is or is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. In this case Sutton showed a total

---

**2.** *State v. Nicholas Todd Sutton,* No. 127 (Tenn. Cr.App., Knoxville, Feb. 27, 1981) (first degree murder of his own grandmother, who was his adoptive mother; life imprisonment).

disregard for human life in the fierceness of the attack, the number of wounds inflicted upon Estep, the victim's pleas for help and the defensive wounds found on the victim. In making a comparative review and considering the nature of the crime and the defendant, we are of the opinion that the imposition of the death penalty by the jury was neither arbitrary nor excessive or disproportionate to the penalty imposed for similar crimes. *Id.*

## II

In defendant's second issue, which contains several sub-issues, he contends that the criminal statutes upon which the verdict is based are unconstitutional under the state and federal constitutions. The Tennessee death penalty statute is constitutional. *State v. Melson,* 638 S.W.2d 342 (Tenn.1982), cert. denied, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *Houston v. State,* 593 S.W.2d 267 (Tenn.1979) cert. denied, 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980).

Defendant avers that the principal question in this case is "the reliability of the evidence," and that the "trial judge would be best suited to pass upon reliability." Defendant suggests that this court reconsider its decision in regard to the trial judge acting as 13th juror in *State v. Johnson,* 692 S.W.2d 412 (Tenn.1985). This is not the proper case to reconsider the 13th juror rule in criminal cases. In this case the trial judge, in preparing his Rule 12 Report, *Rules of the Supreme Court,*[3] in answer to the question "Did you as 'thirteenth juror' find that the defendant was guilty beyond a reasonable doubt?" responded "Yes".

■ Defendant next contends that the trial court erred in not dismissing the indictment because of bad faith of the State in failing to promptly respond to his Rule 16, Tenn.R.Crim.P., discovery motions. This delay, he avers, denied him a fair trial. The evidence in the record does not prepon-

derate against the trial court's finding on the motion for new trial that there was no bad faith on the State's part in responding to the discovery requests, that the defendant was not damaged by any of the delays in this case, and that under the circumstances all matters were addressed within a reasonable time.

■ The Defendant alleges that he was denied his right to have an attorney present at his arraignment, and the trial court erred in refusing to dismiss the indictment on motion pointing out the defect at the arraignment. The defendant did appear at his arraignment without counsel. The trial judge entered a plea of not guilty and appointed an attorney for him. The defendant Street, joined by defendant Sutton, filed a motion prior to trial to set aside the arraignment because he was arraigned without counsel being present. The trial judge denied the motion and Sutton alleges error.

In *State v. Miller,* 668 S.W.2d 281 (Tenn. 1984), this Court noted that it may well be doubted that a criminal defendant is instantly entitled to counsel when he enters the courtroom for the court to ascertain his identity and his indigency in order to appoint counsel for him. Arraignment may or may not be a critical stage requiring counsel depending upon the State's treatment of the defendant's actions. *Compare Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (defendant entitled to counsel because defenses not raised at arraignment considered waived), *and White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (since defendant's non-binding plea could be used at trial even though withdrawn defendant entitled to counsel) *with Vitoratos v. Maxwell,* 351 F.2d 217 (6th Cir.1965) (counsel not required where uncounseled plea or waiver of rights subject to withdrawal and could not be used in later proceedings).

Even assuming, however, that defendant was entitled to counsel because he had

---

**3.** Pursuant to Chapter 51, Public Acts of 1977, this Court promulgated Supreme Court Rule 12 requiring trial judges to complete and submit to this Court a "report of trial judge" in all first-de-

gree murder cases in which life imprisonment or a sentence of death is imposed. *See State v. Barber,* 753 S.W.2d 659 (1988).

been indicted, *see State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn.1980), the absence of counsel here does not necessarily require that the conviction be set aside. Arraignment in this state is a proceeding to inform an accused of the charges instituted by the grand jury, to provide him with a copy, and to "call him to plead." Tenn.R.Crim.P. 10. No substantive defenses are lost if not asserted at this stage. *State ex rel. George v. Bomar*, 216 Tenn. 82, 390 S.W.2d 232 (1965). No objections to the institution of the prosecution or other matters are waived, as these may be raised by motion at any time before trial. Tenn.R.Crim.P. 12, 54(b)(1). In particular, a motion to sever a trial of co-defendants may be made at any time good cause appears, even in the course of the trial. Tenn.R.Crim.P. 14(c).

Automatic reversal is dictated when counsel is denied at some stage in which opportunities are lost, substantive or procedural rights are waived, or some action is not taken and the consequences cannot be discerned from the record. *Satterwhite v. Texas*, —— U.S. ——; 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). An arraignment limited to the matters prescribed in Rule 10, Tenn.R.Crim.P., as it was in this case, is not such a stage.

Except for the matter of consolidation, Sutton advances no particular prejudice from the uncounseled arraignment. He lost no rights, no extraneous events occurred, and no incriminating evidence was obtained. It is plain that this proceeding did not contribute in any way to the conviction; and any error is harmless beyond a reasonable doubt. *See id.*

■ The defendant next avers that the trial court erred in dismissing prospective jurors during voir dire who expressed that under no circumstances could they find a death penalty. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) the Supreme Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accord-

ance with his instructions and his oath." 105 S.Ct. at 852. Our review of the voir dire in its entirety reveals no error under this holding.

### III

■ The defendant Sutton next alleges that he was denied the right to a fair trial because of the conduct of the State in not supplying him sufficient notice of the witnesses which would be used against him. He argues that by providing lists of numerous prospective witnesses, ranging from 80 to 47 names, many of whom were inmates scattered throughout the State correctional system and most of whom the State, defendant alleges, had no intention of calling, denied him his right to effective counsel because defense counsel was unable to interview all these witnesses and investigate the case fully. Nothing in the record supports this allegation. When defense counsel pointed out the problems he was having in reaching all the witnesses, the court granted a continuance.

■ The defendant also alleges prosecutorial misconduct by the Assistant District Attorney General. A knife, identified by State's witness James Worthington as a weapon found in Estep's cell after the murder, was placed on the defense table for inspection by counsel before passing it to the jury. Seeing the knife within reach of the defendants, a number of the correctional officers in the courtroom responded by reaching for their weapons. Defendant insists that the reactions by the guards prejudiced him and deprived him of the "physical indicia of innocence." After the incident, the court instructed the State to have defense counsel examine the weapons at the State's table. The jury knew that the defendants were inmates and it probably came as no surprise to the jurors that they would be closely watched and guarded. The record reflects that only one such incident occurred. We do not find that this incident could have so prejudiced the defendant as to deny him a fair trial. We find no reversible error.

## IV

Defendant in his final issue contends that "the trial court erred in admitting or excluding certain evidence to his prejudice and the totality of these errors was harmful" and reversible error. Our review of the alleged evidentiary errors fails to disclose any errors which were harmful either individually or collectively. For example, defendant asserts that the trial court erred in overruling his objection to the admissibility of two garbage bags found outside Guild 8. Defendant avers this evidence would not be relevant to a material issue in the case. We find the evidence was relevant and material. One bag contained garbage, the other, the clothing which the proof indicated was that of the murderers. There was testimony that the defendants discarded their clothes after the murder. The blood-stained clothes found in the garbage bag corroborated the testimony.

Defendant also alleges that the trial court erred in allowing the State to have James Worthington testify on rebuttal as to statements made to him by Gary Lumbert about the murder. This was not hearsay testimony, as defendant avers, but impeachment by prior inconsistent statements through extrinsic proof. *See* D. Paine, *Tennessee Law of Evidence* §§ 190–194 (1974). The State's cross-examination of Lumbert laid the foundation for impeachment.

Each of the remaining evidentiary contentions advanced by the defendant has been carefully considered. We find none of these to contain merit or to warrant reversal.

In accordance with the mandate of T.C.A. § 39–2–205, we find: that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports the jury's findings of three statutory aggravating circumstances; and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found. Our comparative proportionality review convinces us that the sentence of death is neither excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The sentence of death will be carried out as provided by law on the 14th day of December, 1988, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the defendant.

HARBISON, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.