# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

FILED

December 8, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

FOR PUBLICATION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed: December 8, 1997** |
| | ) | |
| Appellee, | ) | DYER CRIMINAL |
| | ) | |
| v. | ) | Hon. Joe G. Riley, |
| | ) | Judge |
| GLENN BERNARD MANN, | ) | |
| | ) | |
| Appellant, | ) | Supreme Court |
| | ) | No. 02-S01-9609-CC-00077 |

FOR APPELLANT:

William P. Redick, Jr.
Whites Creek, Tennessee

Peter D. Heil
Nashville, Tennessee

Charles S. Kelly
Dyersburg, Tennessee
(Trial Only)

Lyman Ingram
Assistant District Public Defender
Dyersburg, Tennessee
(Trial Only)

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Amy L. Tarkington
Assistant Attorney General
Nashville, Tennessee

C. Phillip Bivens
District Attorney General

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.          DROWOTA, J.

In this capital case, the defendant, Glenn Bernard Mann, was convicted of premeditated first degree murder, aggravated rape and aggravated burglary.[1] In the sentencing hearing, the jury found two aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing burglary." Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising nine claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1996 Supp.),[2] the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on April 25, 1997, entered an Order setting the cause for oral argument at the June term of

---

[1]Although not raised as an issue in this appeal, the trial judge imposed a twenty-five year sentence on the conviction for aggravated rape and a six year sentence on the conviction for aggravated burglary.

[2]"Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

Court in Nashville and stating that "[i]n addition to the statutorily mandated issues . . . the Court will consider . . . [w]hether the District Attorney's offer of a life sentence in exchange for a plea of guilty to capital murder and subsequent seeking of the death penalty upon the defendant's rejection of the offer violates the constitutional rights of the defendant." See Tenn. S. Ct. R. 12.[3]

For the reasons explained below, we have determined that the defendant's constitutional rights were not violated by the State's decision to seek the death penalty after the defendant rejected the plea offer. Moreover, the evidence supports the jury's findings as to aggravating and mitigating circumstances, and the sentence of death is not disproportionate or arbitrary. Accordingly, the defendant's conviction for first degree murder and sentence of death by electrocution are affirmed.

## FACTUAL BACKGROUND

The defendant, Glenn Bernard Mann, was convicted by a jury of the premeditated murder of Annie Lou Wilson, a sixty-two-year-old widow who lived alone in her home in Dyer County, Tennessee. The evidence presented at the guilt phase of the trial established that Wilson was last seen alive on Friday night, July 2, 1993, by two friends who gave her a ride home from the West Tennessee Opry or "Boogie Barn." According to the proof at trial, Wilson, along with her two friends, regularly attended the Boogie Barn on Friday and Saturday nights. Wilson could not drive and

---

[3]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

would get a ride to the Boogie Barn with her daughter or her friends and would usually ride home with her friends when the establishment closed at 11:00 p.m.

After dinner on July 2, Wilson's daughter dropped her off at the Boogie Barn. Wilson rode home with her friends, arriving at approximately 11:30 p.m. After making arrangements to pick her up the next evening and waiting until she was safely inside her home, they left. The next day when her friends stopped by at the designated time, Wilson was not waiting for them on the porch, as was her habit, and they were unable to get a response at the front door. Believing that Wilson had decided to ride with her daughter, they continued to their destination, but Wilson never arrived at the Boogie Barn that evening.

Wilson's daughter, Lottie McPherson, also testified that she was unable to contact her mother by telephone on Saturday, July 3, but assumed her mother was out visiting friends. The next day, after attempting several times more to reach her mother by phone, McPherson became concerned and drove to Wilson's home to check on her. When she arrived, McPherson noticed that the mail had not been removed from the mailbox on Saturday. Fearing that her mother was physically ill, McPherson proceeded to the front door with a key ready, but found that the door was not locked. Upon entering the house, McPherson saw her mother's body lying in the floor of the bedroom, on the left side of the bed. McPherson said her mother's skin was cold and there was blood all around her body. After seeing her mother, McPherson went outside and called 911.

Upon arriving at the scene, police found Wilson's partially nude body on the floor to the left of the bed. Wilson was lying on her back, with her left arm over her head. She had been stabbed numerous times and severely beaten. The front of her night gown and panties had been torn. A large amount of blood was on her head and chest. Blood also was on her legs and arms and at various places in the room, including on the carpet and bed. Investigating officers found several items near the body, including a broken ceramic cat, a brassiere, pieces of white underwear, and a box containing Wilson's hearing aid. From the kitchen floor, officers removed a piece of linoleum which contained a bloody shoe print.

After securing the scene, officers began interviewing neighbors. Tammy Palmer, who lived four houses down from the victim, gave a statement and thereafter testified at trial that, as she was leaving for work on Saturday, July 3, 1993, at approximately 5:00 a.m., she noticed a man walking down the street. He was wearing orange shorts and no shirt and appeared to weigh 180 to 200 pounds and be between 5'10" and 6'0" in height. Palmer said that when she came out of her house, the man stopped for a few seconds and looked up the driveway toward her. Shortly after the murder, police asked Palmer if she could identify the man she had seen from a group of photographs. Palmer selected a person other than the defendant, but told officers she was not sure that the person in the chosen photograph was actually the man she had seen. Palmer informed the officers that she would need to see the man in person to positively identify him. At trial, Palmer identified the defendant as the man she had seen that morning. Palmer had never seen Mann prior to the morning of the murder, and had not seen him since that time until the day of her testimony.

-5-

Officers also spoke with the defendant, who lived about six houses down from the victim and was sitting on his porch the morning of the murder. Mann acknowledged that he knew the victim and said that he and his wife were friends of Wilson and previously had eaten dinner at her home. Mann consented to a search of his house and allowed the officers to take a pair of tennis shoes, some shoe strings, red shorts, and a shirt for further testing. A few days later, the officers obtained a search warrant to collect blood and saliva samples from the defendant.

On July 7, 1993, police investigators asked the defendant and several members of his family to accompany them to the police station for questioning. Although no charges had been brought, the defendant was advised of his constitutional rights. During the initial interview, Mann denied any involvement in Wilson's murder. Mann said that Wilson had been generous to him and his family by providing them meals and allowing them to use her phone. He claimed that he had not even been in the neighborhood at the time of her murder. When confronted with inconsistencies in his alibi, however, Mann admitted that he had broken into Wilson's home and killed her. However, this interview was not tape-recorded due to an oversight[4] by the investigating officers. Though he initially refused, after being allowed to speak with his wife, Mann gave another statement which was recorded.

During this interview, Mann said that he awoke on Saturday, July 3, and decided to walk around his neighborhood. He was wearing red shorts, white "K-Swiss" shoes, and no shirt. He remembered seeing a woman standing in her

_____

[4]The "pause" button on the tape recorder was engaged.

–6–

driveway as he walked through the neighborhood. He stopped for a moment, but continued walking and at some point, decided to go to Wilson's home, intending to steal her television and pawn it to get money to pay his rent. He arrived at Wilson's home at approximately 6:00 a.m. After knocking on the front door several times and receiving no answer, Mann shoved the door open with his shoulder and walked toward the television. When Mann saw Wilson coming out of the bedroom, he grabbed a sheet off the couch, threw it over her head so that she could not see him, and ran towards the front door. When Wilson pulled the sheet off her head and called out his name, Mann ran back and pushed Wilson into the bedroom and onto the bed.

The precise order in which events occurred thereafter is not exactly clear, but the evidence established that Wilson, who was hearing impaired, reached for the box containing her hearing aid. Mann knocked it out of her hand. As Wilson continued to call Mann's name, he grabbed a sheet from the bed, covered her face, and held her down by placing his hand around her neck. At some point while she was on the bed, and before she was struck in the head, Mann tore off Wilson's underwear, digitally penetrated her vagina while masturbating, and ejaculated onto her body. Mann grabbed a ceramic cat statue and struck the victim twice in the head with it, knocking her to the floor on the left side of the bed. While the victim lay on the floor, Mann ran to the kitchen and obtained a knife. According to Mann, the victim was conscious and calling out his name during this time. Upon returning to the bedroom, Mann stabbed Wilson in the chest several times, because, at first, the knife "wouldn't go in." Finally, he "pulled the knife out, got up and went home." When Mann arrived home, his wife was asleep. He washed his hands with a blue wash cloth and went

to bed, but was unable to sleep because he was "hurting." Mann said that he later burned the shorts he was wearing and discarded the knife he had used near a levee.

Mann specifically denied telling anyone, other than the police, about the facts of the murder. Denying that he had intended to kill Wilson, Mann said that he only had intended to steal her television and pawn it for rent money, and that he had specifically chosen her house because he knew she was hearing impaired and thought he could get in and out without being detected. Mann attempted to describe the strange feeling that had come over him before he committed the murder. He denied being under the influence of drugs at the time of the killing and repeatedly told the interrogating officer that he had a problem and needed help. Mann did not testify at trial, but the recorded confession was played for the jury.

Dr. O'Bryan Clay Smith, the Deputy Chief Medical Examiner for West Tennessee, performed the autopsy on Wilson's body. Dr. Smith opined that Wilson had sustained at least fifteen blows to the head by blunt force, resulting in lacerations, bruises and abrasions. Some of the injuries were consistent in pattern with the broken portion of the ceramic cat. Dr. Smith testified that such head injuries can be fatal, but did not cause instantaneous death in this case.

Dr. Smith testified that Wilson also had suffered fourteen superficial stab wounds to the abdomen, and eleven separate stab wounds to the chest area, ranging in depth from just under one inch to over four inches. One of the stab wounds penetrated Wilson's lung and had a portion of her night gown embedded in it. Another wound penetrated the left ventricle of her heart. Dr. Smith determined that

either wound would have been fatal, and could have resulted in death in as little as several minutes or as long as an hour following infliction of the wound. The wounds did not, however, result in instantaneous death. Dr. Smith also found injuries to Wilson's neck consistent with manual strangulation, but concluded that these injuries did not result in instantaneous death. The autopsy revealed that Wilson had sustained two fractured ribs as a result of the stab wounds. She suffered a laceration of the vaginal tissue, which, Dr. Smith opined, was caused by an object being forcefully placed in her vagina. The autopsy revealed extensive swelling around Wilson's left wrist and thumb area as well as deep bruising in the left wrist region, which extended into the tendon sheath of the wrist itself. This bruising was caused by considerable blunt force and was consistent with defensive wounds. Dr. Smith concluded that Wilson died from multiple injuries: blunt force to the head, compressive forces applied to the neck, and multiple stab wounds to the chest and abdomen, but he was unable to determine in which order the wounds were inflicted. Based on the pattern of dried blood on Wilson's left arm and right leg, however, Dr. Smith concluded that Wilson was in an upright position for some period of time after the blows to her head were inflicted.

A Tennessee Bureau of Investigation (T.B.I.), forensic specialist in shoe and tire track comparisons and fiber and physical comparisons testified at trial. She had performed a shoe track comparison on the white tennis shoes recovered from Mann's home and the partial foot print on the piece of linoleum recovered from the victim's home and determined that the shoes were consistent in size, shape, and tread design with the print on the linoleum. No definitive match was possible, however, since no individual characteristics, such as cuts, tears, or wear patterns were present

on the shoes.  In addition, she had compared three knives recovered from Mann's home with the cuts in the victim's nightgown and had concluded that any of the knives could have made the cuts.  Finally, she found no evidence of fiber transfers from another source onto the victim's clothing or bedding.

Also testifying for the State was a T.B.I. serology specialist who said she found human blood on one of the white tennis shoes, but the quantity was insufficient to conduct further testing.  No blood was found on the orange shorts recovered from Mann's home.  Although human blood was found on the blue wash cloth recovered from Mann's house, the blood was preserved for DNA analysis, so no further testing was performed.  On  the ceramic cat removed from the scene of the crime blood consistent with that of the victim was found.  Finally, semen and spermatozoa were found in combed pubic hair obtained from the victim's body.

Due to problems with the manner in which evidence was collected and stored, the forensic DNA analyst with the T.B.I. testified that she was only able to perform adequate DNA testing on a pair of Mann's socks and a pair of red shorts.  Blood was found on these items, but it matched that of Patrick Sweatt, an individual with whom Mann had fought on July 1, 1993, two days before Wilson's murder.

The defendant offered no proof during the guilt phase of the trial. Based upon the proof presented by the State, the jury found Mann guilty of premeditated first degree murder.

At the sentencing phase of the trial, Dr. Smith again testified for the State. He stated that the fifteen blows to Wilson's head would have been severely painful and caused profuse bleeding, but were probably "insufficient to cause unconsciousness." Because the blows were inflicted with moderate to severe force which would have produced a large amount of medium velocity blood spatter, and because the crime scene did not reflect the expected blood spatter, Dr. Smith concluded that the victim's head was probably wrapped in a blanket. Dr. Smith also observed that the manual strangulation, evidenced by the bruises on the victim's neck, would have been painful, causing "extreme distress as [the victim became] hungry for air." Though the stab wounds which penetrated the victim's heart and lung would have caused pain and bleeding, and interfered with Wilson's ability to breath, Dr. Smith determined that none of the wounds caused instantaneous death. Likewise, although not fatal, the abdominal puncture wounds would have caused moderate pain and minimal bleeding. Dr. Smith opined that all of the wounds were inflicted prior to the victim's death. He said that she could have survived as little as several minutes or as long as an hour after the stab wounds were inflicted. Based on the blood spatters in the bedroom, and the pattern of blood flow on the victim's clothing and body, Dr. Smith opined that some of the wounds were inflicted while Wilson was conscious and in an upright position.

Testifying on behalf of the defendant was Dr. Chris Sperry, the Deputy Chief Medical Examiner for Fulton County, Georgia. Dr. Sperry reviewed the autopsy report and opined, contrary to Dr. Smith, that the initial blow to her head rendered Wilson unconscious. Dr. Sperry based this conclusion on the nature and severity of the head injuries and the lack of defensive wounds to Wilson's hands and arms. If

the victim had been unconscious during the attack, Dr. Sperry said, she would not have felt the pain caused by the various wounds. When questioned on cross-examination, however, Dr. Sperry opined that Wilson had suffered "serious physical abuse beyond that necessary to produce death."

Through the testimony of his mother, the jury learned that Mann is the ninth child in a family of ten living children. Mann was placed in special education classes until he dropped out of school in ninth grade. Mann lived with his parents until he married, and according to his mother, Mann was helpful at home. The defendant's mother asked the jury to forgive her son and grant him a second chance. She said that she has given up three children in death and does not want to lose another.

The defendant's father testified that he has served as the pastor of the Original Church of Jesus Christ in Dyersburg for nineteen years. He said that Mann had been brought up in church. He apologized to the victim's family and asked the jury to spare Mann's life, saying that executing the defendant will not correct the wrong that has been done.

Finally, the defendant's wife of just over one year testified that Mann had been a kind and considerate husband. She made an emotional plea to the jury to spare her husband's life.

Based upon the proof, the jury determined that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious

physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing burglary." Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991). In addition, the jury found that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and, as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

## PLEA NEGOTIATIONS

Prior to and during the trial of this case, the District Attorney General offered Mann a plea bargain agreement, life imprisonment in exchange for a guilty plea. Mann rejected the offer. The case went to trial with the State seeking the death penalty, and the jury imposed the death penalty. Realizing, through the benefit of hindsight, that the plea offer would have afforded him a more desirable outcome, Mann now urges that his constitutional rights were violated because the State's action in seeking the death penalty after he rejected the plea offer burdened the exercise of his constitutional right to a jury trial. We disagree.

A defendant who pleads guilty extends a substantial benefit to the criminal justice system, and in exchange, the State is entitled to extend a less harsh sentence than might otherwise be given. Brady v. United States, 397 U.S. 742, 752-53, 90 S.Ct. 1463, 1471-72, 25 L.Ed.2d 747 (1970); see also Corbitt v. New Jersey, 439 U.S. 212, 219, 99 S.Ct. 492, 497, 58 L.Ed.2d 466 (1978). Likewise, if a plea offer is

-13-

rejected, the State may prosecute the defendant to the fullest extent possible and seek whatever punishment is appropriate under the law. <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); <u>see</u> <u>also</u> <u>United States v. Goodwin</u>, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); <u>State v. McMurtrey III</u>, 726 P.2d 202, 207 (Ariz. 1986) (citing cases); <u>State v. Smith</u>, 931 P.2d 1272, 1275 (Mont. 1996); <u>United States v. Jones</u>, 973 F.2d 928 (D.C. Cir. 1992).

An examination of the relevant authority reveals that the defendant's assertion that the State should be limited in its prosecution to the the terms of an offer made during plea negotiations is without merit. In <u>Hayes</u>, the defendant was tried on an indictment charging him as an habitual criminal, for which the mandatory punishment was life imprisonment. The prosecutor, during pre-trial negotiations, had been willing to accept a plea of guilty to a lesser charge which carried only a two to ten year sentence range. The prosecutor explicitly advised Hayes that he would return to the grand jury, obtain a new indictment, and proceed on the more serious charge if Hayes did not plead guilty and "save the court the inconvenience and necessity of a trial." <u>Id</u>. at 359, 98 S.Ct. at 665. The defendant rejected the offer, chose to go to trial, was convicted, and was sentenced to life imprisonment.

Hayes challenged the conviction and the sentence, contending that his constitutional rights had been violated. The United States Supreme Court rejected the challenge, concluding that the State, through the prosecutor, had not violated the Constitution since it "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly

subject to prosecution." Id. at 365, 98 S.Ct. at 669. The Hayes Court explained its decision as follows:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. To hold that the prosecutor's desire to induce a guilty plea is an unjustifiable standard, which like race or religion, may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself.

Id. at 364-65, 98 S.Ct. at 668-69 (internal citations, quotations and footnotes omitted). Even though recognizing that "confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect upon the defendant's assertion of his trial rights," the Hayes Court, nevertheless, concluded that "the imposition of these difficult choices [is] an inevitable - - - and permissible - - - attribute of any legitimate system which tolerates and encourages the negotiation of pleas." Id. at 364, 98 S.Ct. at 668 (internal quotations and citations omitted). The Court accepted as "constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty." Id.

The principles announced in Hayes were reaffirmed by the Court in Goodwin. Concluding that "the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution," the Court refused to accept the defendant's argument that his right to a jury trial had been impermissibly

-15-

burdened by the State's decision to charge him with a felony offense when he refused to plead guilty to a misdemeanor. Id., 457 U.S. at 382, 102 S.Ct. at 2493. Consequently, the Court held that an initial charging decision is not binding upon the State with respect to the future course of the prosecution. Id.

These cases recognize the State's legitimate interest in encouraging the entry of guilty pleas and in facilitating plea bargaining, a process mutually beneficial to both the defendant and the State. Corbitt, 439 U.S. at 222, 99 S.Ct. at 499. Since, under this authority, the State is not constitutionally limited or bound by its initial formal charge, the State certainly is not limited or bound, as the defendant argues, by a plea offer which was rejected by the defendant. When a plea is rejected, the State may prosecute a defendant to the fullest extent of the law and seek the most severe punishment available under the law. Cf. State v. Hines, 919 S.W.2d 573 (Tenn. 1995)(upholding a trial judge's refusal to approve a plea bargain agreement which resulted in the case going to trial in which the defendant was sentenced to death); Parham v. State, 885 S.W.2d 375, 381 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994)(guilty plea is not involuntary by the fact that the accused is faced with an election between possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea). To hold, as the defendant urges, that the State can pursue no greater charge or seek no greater punishment than that offered during plea negotiations could effectively abolish the practice of plea bargaining in first degree murder cases. Prosecutors would rarely, if ever, be willing to make an offer of leniency in exchange for a guilty plea. We decline to adopt such a radical and far reaching principle. We agree with the United States Supreme Court that

> [w]hatever might be the situation in an ideal world, the fact is that the guilty plea and the concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned. The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources. The public is protected from the risks posed by those charged with criminal offenses who are at large on bail while awaiting completion of criminal proceedings.

Blackledge v. Allison, 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136 (1977). Plea negotiations often give rise to difficult choices for a defendant. Indeed, "[t]he criminal process . . . is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." Corbitt, 439 U.S. at 220, n. 8, 99 S.Ct. at 498, n. 8 (internal citations and quotations omitted). In this case, the defendant was faced with the choice of pleading guilty and being sentenced to life imprisonment or exercising his constitutional right to a jury trial, and facing the broad spectrum of possibilities, including, on the one extreme, an acquittal of all charges, and on the other extreme, conviction for first degree murder and imposition of the death penalty. Mann decided to exercise his constitutional right to a jury trial, and he must now accept the consequences of that choice.

Mann's reliance upon United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), is misplaced. Under the federal kidnapping statute at issue in that case, a convicted defendant could be sentenced to death if he had requested a jury trial, but could be sentenced to no more than a life sentence if he had either

pleaded guilty or pleaded not guilty and waived the right to a jury trial. Only those who insisted upon a jury trial faced the possibility of a death penalty. The Court declared the statute unconstitutional because it "impose[d] an impermissible burden upon the exercise of a constitutional right." Id., at 572, 88 S.Ct. at 1211. Unlike the statute at issue in Jackson, Tennessee law does not reserve the maximum punishment for murder for those who insist on a jury trial. Indeed, under Tennessee law, the State is free to seek the death penalty following entry of a guilty plea. See Tenn. Code Ann. § 39-13-205(a) (1991 Repl.). Accordingly, we conclude that the defendant's assertion that the State violated his constitutional rights by seeking the death penalty after he rejected the plea offer and exercised his right to a jury trial is without merit.

## SUFFICIENCY OF EVIDENCE - AGGRAVATING CIRCUMSTANCES

Pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(B) (1991 Repl.), we have examined the evidence to determine whether it is sufficient to support the aggravating circumstances found by the jury and whether it is sufficient to support the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We conclude that the evidence clearly is sufficient to support these findings.

In accordance with this Court's decision in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985), the trial court correctly instructed the jury as to the definitions of the terms, "heinous," "atrocious," and "cruel." See also State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). Also in accordance with Williams, the trial court instructed the jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Id. The evidence is clearly

-18-

sufficient to establish both torture and serious physical abuse beyond that necessary to produce death. This sixty-two year old victim was digitally raped and as a result suffered a one inch laceration of the vaginal tissue. She sustained *at least* fifteen blows to the head which were, according to the expert testimony, severely painful. She suffered eleven stab wounds to her chest, ranging in depth from under one inch to over four inches, one penetrating her heart and another her lung. According to the undisputed proof, these wounds would have been painful and interfered with her ability to breath. The victim sustained fourteen additional puncture wounds to her abdomen which would have resulted in pain. She was also manually strangled which, according to the medical testimony, would have caused severe distress as her air supply was terminated. There is no dispute in the proof that the victim was alive when these injuries were inflicted. Although the proof was disputed, the evidence is sufficient to support the conclusion that the victim was also conscious during the time many of these wounds were inflicted. In his statement, the defendant said that Wilson called his name over and over, even after he had digitally raped her, struck her in the head with the statue, and was on his way to the kitchen to obtain a knife. Dr. Smith testified that the pattern of blood on the victim's body and the blood spatters in the bedroom indicated that Wilson was in an upright position and conscious for a time during the attack. Finally, Dr. Smith stated that the bruising around Wilson's left wrist was consistent with a defensive wound. Though the defendant offered expert testimony to counter the State's proof relating to consciousness, Dr. Sperry admitted on cross-examination that Wilson had been subjected to serious physical abuse beyond that necessary to produce death. Accordingly, we conclude that the evidence is sufficient to support the jury's finding that this murder was especially heinous, atrocious, or cruel in that it involved torture

or serious physical abuse beyond that necessary to produce death. See State v. Bush, 942 S.W.2d 489 (Tenn. 1997).

The evidence is also sufficient to sustain the jury's finding that the murder was committed while the defendant was engaged in committing burglary. The trial judge correctly instructed the jury that "burglary is defined as the unlawful entry into a building or habitation of another without the effective consent of the owner with the intent to commit a felony or theft and the person must have acted intentionally or knowingly." The defendant admitted in his statement that he forced open the door to the victim's home with the intention of stealing her television to pawn for rent money. The proof in this record, therefore, is sufficient to support the jury's finding of this aggravating circumstance.

With respect to the jury's finding that the aggravating circumstances outweighed any mitigating circumstances, we have previously held that whether mitigation exists and the weight given aggravating and mitigating circumstances are issues within the province of the jury. State v. Barber, 753 S.W.2d 659, 669 (Tenn. 1988). In this case, the trial judge specifically instructed the jury to consider the following mitigating circumstances: (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) the youth of the defendant at the time of the crime; (3) the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as the result of mental disease or defect which was insufficient to establish a defense to the crime but which substantially affected his judgment; and (4) any other mitigating factor which is raised

by the evidence, produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The proof demonstrates that Mann was twenty-two years old at the time this offense was committed. He claimed that he had no intention of killing the victim when he broke into her home, and did so only when she unexpectedly emerged from the bedroom, and surprised him by calling his name. Based on this portion of the defendant's statement, counsel for the defense argued to the jury that the murder was committed while the defendant was under extreme mental or emotional disturbance. Also in his statement the defendant mentioned that a strange feeling came over him before he committed this crime and Mann told the interrogating officer that he had a problem and needed help for it. Defense counsel, based upon this proof, argued that Mann committed the crime because he has a defective mind and is suffering from a mental disease or defect. Finally, defense counsel asked the jury to consider the testimony of Mann's family -- his mother, father, and wife -- all of whom asked the jury to spare Mann's life. The trial judge offered to charge the jury on any non-statutory mitigating circumstances submitted by the defense, but no specific instructions were requested. In addition, the trial judge allowed the defense broad leeway to advance mitigating circumstances to the jury during closing argument. Based upon the proof in this record, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstances outweighed any mitigating circumstances.

## COMPARATIVE PROPORTIONALITY REVIEW

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The defendant is therefore, asserting that his claim is comparatively disproportionate. In the recent case of State v. Bland, ___ S.W.2d ___ (Tenn. 1997), we discussed in detail the precedent-seeking analysis this Court has employed over the past eighteen years in determining whether the death sentence imposed in a particular case is *disproportionate* to the sentence imposed in similar cases. In conducting comparative proportionality review, we begin with the presumption that the sentence of death is proportional to the crime of first degree murder. Therefore, as we emphasized in Bland the purpose of comparative proportionality review is to "eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty." Id., ___ S.W.2d at ___.

As we had previously explained, and reaffirmed in Bland, comparative proportionality review is not a rigid, objective test. Id., ___ S.W.2d at ___, Slip Op. at 23; Cazes, 875 S.W.2d 253, 270 (Tenn. 1994). We do not employ a mathematical formula or scientific grid, nor are we bound to consider only those cases in which exactly the same aggravating circumstances have been found by the jury. State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). After identifying a pool of similar cases, we consider a multitude of variables, some of which were listed in Bland, in light of the experienced judgment and intuition of the members of this Court. Bland, ___ S.W.2d at ___.

Applying that analysis, we conclude that imposition of the death penalty for the senseless, brutal, premeditated killing of this innocent elderly woman is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Mann's actions showed a total disregard for human life. The victim, a sixty-two year old widow, lived near the defendant and had befriended Mann and his family. As a result of her kindness toward him, the defendant knew that the victim lived alone and was hearing impaired. In fact, he chose to burglarize her home because he had specific knowledge about her vulnerability and about her property. When the victim walked out of her bedroom and surprised Mann in the act of burglarizing her home, he did not hesitate to brutally assault and murder her. He had no provocation, except her recognition of him. The defendant inflicted *at least* forty wounds upon the victim, including fifteen blows to the head, eleven stab wounds to the chest, and fourteen puncture wounds to her abdomen, all of which resulted in pain for the victim. In addition, the defendant digitally raped and manually strangled the victim. Throughout the entire ordeal, according to the defendant's own statement the victim was alive and conscious and calling out her attacker's name. Other proof indicates that the victim was alive and conscious for *at least* some part of the attack. Following the murder, Mann was calm. He went home, washed himself, changed clothes, and went to bed. He calmly spoke to the police the next day. Though the defendant was young at the time of the killing, only twenty-two years old, many others have arrived on death row at an earlier age.[5] Considering the nature of this crime and the character of this defendant, this murder places Mann into the class of defendants for whom the death penalty is an appropriate punishment. Based upon

---

[5]At least 44 of the persons sentenced to death in Tennessee since 1977 were between the ages of 19 and 25 when they committed the murder and at least ten were 18 or 19 when the offense was committed.

our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Bush, 942 S.W.2d 489 (Tenn. 1997), the eighteen-year-old defendant was sentenced to death for the murder of a helpless seventy-nine year old widow. There, the defendant used the victim's friendship with his grandmother to gain access to her home. Therefore, Bush, like the defendant in this case, was aware that the victim lived alone and was vulnerable. Once inside, Bush, like the defendant in this case, brutally murdered the helpless victim without any provocation by savagely beating her with a stick and by stabbing her forty-three times. He later boasted to acquaintances about practicing karate on the victim. As in this case, the jury found two aggravating circumstances including that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. 39-13-204(i)(5) & (I)(6) (1991 Repl).[6] The jury imposed the death penalty even though Bush, unlike the defendant in this case, presented substantial proof in mitigation relating to his youth, troubled childhood, mental disease or defect, and lack of a prior criminal record.

In State v. Sylvester Smith, 893 S.W.2d 908 (Tenn. 1994), the forty-one-year-old defendant was sentenced to death for the murder of an elderly widow who lived

---

[6]Although the trial judge erroneously charged the jury in the language of the 1989 statute, in Bush we held that the error was harmless beyond a reasonable doubt, concluding that the proof established that the murder was heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-13-203(i)(5) (1977 & 1982) (Repealed).

alone in her home in Shelby County. During the course of robbing her home, the defendant beat the victim over her entire body. Her throat had been cut twice. She had been raped, and her body placed in a tub of water one to two inches deep, with a blanket wrapped around her head. The proof showed that Smith carried a weapon with him to commit the crime, a knife he had taken from his sister's home. In mitigation, the defendant introduced proof of his low IQ and attempted to establish that he was mentally retarded. As in this case, Smith sexually assaulted and brutally murdered the elderly female victim in her own home, without any provocation or justification. The jury found three aggravating circumstances, including that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind,[7] Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), the twenty-seven-year-old defendant was sentenced to death for the murder of a helpless, elderly woman who lived alone. Cazes worked sporadically as a welder for the victim's step-grandson, and like the defendant in this case, Cazes had been to the home of his victim on prior occasions. Like the defendant in this case, Cazes struck his victim in the head numerous times with a blunt object, most likely a welder's chipping hammer which he had taken with him to the scene of the crime. Her skull was virtually crushed, but the proof showed, as it does in this case, that she was alive and conscious during a portion of the attack. As did the defendant in this case, Cazes sexually assaulted the

---

[7]The jury also found two other aggravating circumstances: that the defendant had been previously convicted of violent felony offenses and that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39-2-203 (i)(2) & (7) (1982). Even though it was error under State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992) (Drowota, J. & O'Brien, J., Dissenting) for the jury to consider the felony murder aggravating circumstance since Smith was convicted of first degree felony murder, this Court determined that the error was harmless beyond a reasonable doubt.

victim, raping her both anally and vaginally at or near the time of death. Cazes presented a great deal of proof about his troubled childhood, and he presented expert testimony about his impaired mental abilities. The jury found three aggravating circumstances, including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.[8] Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), the twenty-nine-year-old defendant was sentenced to death for the murder of a helpless seventy-five year old woman who lived alone. Barber and his brother decided to rob the victim. Barber's brother knew the victim because he had worked for her on several prior occasions. To gain entry into her home, the defendant broke out the back window with a crescent wrench. When the victim recognized Barber's brother and started toward the phone to call the police, Barber repeatedly hit her on the head with the crescent wrench. She was alive and conscious during the attack as evidenced by the defensive wounds on her arms and hands. As in this case, the defendant was aware, because of the relationship between the victim and his brother, that the victim was in bad health and used a walker. As did Mann in this case, Barber had no hesitation about brutally murdering the victim upon no more provocation than her recognition of one of her assailants. As mitigation, Barber, like Mann, relied upon his youth, and also his capacity for rehabilitation. As in this case, the jury found that the murder was

_____

[8]As in Smith, supra, the jury also found that the defendant had been previously convicted of violent felony offenses and that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39-2-203 (i)(2) & (7) (1982). As in Smith, this Court found that the jury's consideration of the felony murder aggravating circumstance was harmless error beyond a reasonable doubt.

especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982).[9]

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the twenty-nine-year-old defendant was sentenced to death for the murder of a seventy-year-old widow, who was frail, weighing less than one hundred pounds, but still capable of living alone. McNish, on the other hand, weighed one hundred and sixty-five pounds and held a black belt in karate. Like the defendant in this case, McNish was acquainted with his victim and was aware of her physical limitations. Also like the defendant in this case, McNish struck the victim in the head many times with an object he found in her home, a glass vase. Her skull was fractured in several places, but she was partially conscious when she was found by a neighbor. Therefore, as in this case, she recognized her attacker and suffered pain from the injuries he inflicted. McNish, a heavy user of prescription drugs, apparently was attempting to borrow money from the victim when the attack began. The jury found one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203 (i) (5) (1982).

In State v. Harbison, 704 S.W.2d 314 (Tenn. 1986), the twenty-seven-year-old defendant was sentenced to death for the murder of a sixty-two year old woman. Harbison, like the defendant in this case, was a casual acquaintance of the victim. As in this case, Harbison was surprised by the victim while he was burglarizing her

---

[9]The jury also relied upon the felony-murder aggravating circumstance as a basis for imposition of the death penalty. In Barber v. State, 889 S.W.2d 185, 189-90 (Tenn. 1994), this Court held the jury's consideration of that aggravating circumstance harmless error beyond a reasonable doubt.

-27-

home.  When the victim reached for her purse, Harbison said that he thought she was reaching for a gun and after they began "tusslin," he grabbed a marble vase and hit her in the head with it.  The medical testimony showed that the victim was struck at least three times, causing massive skull fractures.  The blows were inflicted with such force that the victim's face was literally crushed and disfigured beyond recognition and brain tissue was protruding through the lacerations.  As mitigation, the defendant asked the jury to consider that he had no significant prior criminal record, as in this case, and also that death was instantaneous and that he did not bring a weapon to the crime scene.  The jury found one aggravating circumstance, that the murder was committed while the defendant was engaged in committing burglary.  Tenn. Code Ann. § 39-2-203(i) (7) (1982).

In State v. Cone, 665 S.W.2d 87 (Tenn. 1984), the thirty-three-year-old defendant was sentenced to death for the murder of an elderly couple.  Hiding and attempting to escape the police after he had burglarized a jewelry store, Cone entered the home of Mr. Todd, ninety-three years of age, and his wife, seventy-nine years of age, by breaking a latch on the rear door.  The elderly couple were repeatedly beaten about the head with a blunt instrument, with multiple crushing blows to the head.  Based on the defensive wounds which appeared on their arms and hands, the victims, as in this case, were conscious during some part of the attack.  Also like this case, the defendant admitted the killing, but asserted that his mental capacity was impaired by drug use and service in Vietnam.  The jury found four aggravating circumstances, including that the murder was especially heinous,

atrocious, or cruel in that it involved torture or depravity of mind.  Tenn. Code Ann. § 39-2-203 (i) (5) (1982).[10]

In State v. Melson, 638 S.W.2d 342 (Tenn. 1982), the defendant, a farm foreman, was sentenced to death for murdering the farm owner's wife.  A blunt instrument, probably a hammer or crescent wrench, was used to repeatedly beat the victim about the head with such force that pieces of her cranium were embedded into her brain.  Trauma to her arms and hands demonstrated that, as in this case, she was conscious and attempting to defend herself during some portion of the ordeal.  The only motivation the defendant had for committing the murder was that his victim had discovered him stealing gasoline from the farm supply.  Melson had no prior record of significant criminal activity.  The jury found two aggravating circumstances including that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.  Tenn. Code Ann. § 39-2-203 (i) (5) (1977).[11]

As we have emphasized again and again, no two cases are identical, but the above cases have many similarities with Mann.  In all eight of the cases, the victims were repeatedly beaten about the head with a blunt instrument causing or contributing to their death.  Without any provocation, all eight defendants gained entry into the home of the helpless victims and viciously attacked them.  In seven of

---

[10]The three additional aggravating circumstances found by the jury include: (1) the defendant had previously been convicted of one or more felonies involving the use or threat of violence to the person; (3) the defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder; (2) the murders were committed for the purpose of preventing a lawful arrest or prosecution.  Tenn. Code Ann. § 39-2-203(i)(2) & (3) & (6) (1977).

[11]The jury also found that the murder was committed for the purpose of preventing a lawful arrest or prosecution.  Tenn. Code Ann. § 39-2-203(i)(6) (1977).

the eight cases, as in this case, the victims were conscious and experienced the pain and terror of the attacks. In six of the eight cases the defendant, as in this case, knew his victim and was aware of the victim's specific frailties and vulnerabilities. Like this case, there was great disparity of strength between the victims and the defendants. The victims were sexually assaulted in two of the eight cases, as was the victim in this case. In seven of the eight cases, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity. Similarly, in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. In many of the cases, the murder occurred while the defendant was engaged in a robbery or burglary. Like Mann, many of the defendants relied upon their youth and mental disabilities as mitigation of the punishment. After reviewing the cases discussed above and many other cases not herein detailed,[12] we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

---

[12]We also have reviewed other cases in which the defendants received a sentence of life imprisonment. However, there are few life sentence cases which bear similarities to the circumstances of this crime and this defendant. The two most similar are easily distinguishable. In State v. Sepulveda, No. 03C01-9402-CR-00069, (Tenn. Crim. App., at Knoxvile, June 26, 1997) (application filed August 25, 1997), the nineteen-year-old defendant burglarized the home of his ninety-five-year-old neighbor looking for money, or for property to sell to buy drugs. During the course of the burglary, he beat the victim with his hands and kicked her in the head. She was alive when found by friends and taken to a hospital and later to a nursing home. She died some weeks later from her injuries. The defendant had a longstanding drug problem, evidenced by an extensive juvenile record for drug offenses. He had only an eighth grade education; his father had died when he was four months old, and his sister had committed suicide at an early age. The jury sentenced the defendant to life imprisonment. Though the killing in that case was reprehensible, the defendant did not utilize a weapon, such as a knife, as did the defendant in this case, and he had a long history of drug problems. Likewise, in State v. Whitmore, No. 03C01-9404-CR-00141 (Tenn. Crim. App., at Knoxville, June 19, 1997)(application filed August 18, 1997), the eighty-year-old neighbor of the defendant's grandparents was found dead in his home, stabbed thirteen times in the neck and chest. The defendant, and a co-defendant robbed the man to obtain money for drugs. When the victim recognized them, Whitmore's co-defendant killed him with Whitmore's knife. The co-defendant was found to be mentally retarded and not subject to the death penalty. The State sought the death penalty with respect to Whitmore, but the jury returned a sentence of life imprisonment. Unlike the defendant in this case, Whitmore did not actually inflict the fatal wounds.

**CONCLUSION**

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1991 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C) (1991 Repl. & 1996 Supp.). We have considered the defendant's assignments of error and determined that none have merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes, and joined in by Judge Jerry L. Smith and Special Judge Lynn W. Brown. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 15th day of April, 1998, unless otherwise ordered by this Court or other proper authorities.

_____

Frank F. Drowota, III,
Justice

**CONCUR:**
Anderson, C. J.,
Birch, Holder, JJ.

Reid, J., -Concurring in the Results Only.