# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### NOVEMBER SESSION, 1997

FILED

February 5, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9611-CC-00495 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | WILLIAMSON COUNTY |
| VS. | ) | |
| | ) | HON. DONALD P. HARRIS |
| JAMES E. GORDON, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Aggravated Burglary and First |
| | ) | Degree Murder) |

## ON APPEAL FROM THE JUDGMENT OF THE CIRCUIT COURT OF WILLIAMSON COUNTY

FOR THE APPELLANT:

JOHN H. HENDERSON
Public Defender
407 C Main Street
P.O. Box 68
Franklin, TN 37065-0068

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

JOSEPH BAUGH
District Attorney General
P.O. Box 937
Franklin, TN 37065-0937

OPINION FILED _____

AFFIRMED AS MODIFIED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, James Earl Gordon, appeals as of right pursuant to Rule 3, Tennessee Rules of Appellate Procedure. He was convicted of first-degree intentional murder and sentenced by the jury to life imprisonment without the possibility of parole. He was also convicted of aggravated burglary and sentenced as a Range I, standard offender to six years imprisonment in the Department of Correction, to be served consecutively to his sentence of life without parole. The Defendant raises several issues in this appeal: (1) That the evidence was insufficient to convict him of first-degree murder; (2) that the evidence was insufficient to convict him of aggravated burglary; (3) that the jury erred by sentencing him to life without the possibility of parole for his murder conviction; (4) that the trial court erred by ordering a six-year sentence for the aggravated burglary conviction; and (5) that the trial court erred by ordering the aggravated burglary sentence be served consecutively to the sentence of life without parole.

The Defendant was convicted of killing his father-in-law, Don Beasley. Don Beasley, his wife Lou, and daughter Amy were living in St. Louis, Missouri in early 1992 when Amy became acquainted with the Defendant. Don Beasley, a former architect, and Lou Beasley were pursuing careers in the ministry. Amy Beasley met the Defendant her first night of work as a stripper in a bar in East St. Louis. He told her she "was the one" and that he was going to marry her. Amy began a romantic relationship with the Defendant and became pregnant by him

in the summer of 1992. They married on October 9, 1992. Their daughter, Savannah, was born in March, 1993. Don and Lou Beasley moved to Franklin, Tennessee on December 1, 1994, and both of them were employed by a local church.

Amy and the Defendant developed marital problems which included altercations. Amy first visited her parents in Franklin, then moved to Tennessee in February, 1995 and instituted divorce proceedings. Amy was employed by an automobile dealer in Franklin, from whom she bought a red Honda Accord. The Defendant was angry and frequently called her parents' house, where Amy was living. He made frequent attempts to reconcile with Amy, who wavered regarding her intent to divorce the Defendant. The Defendant moved to Nashville in March or April of 1995, returned to St. Louis, then moved back to the Nashville area in August, 1995. He was living with several roommates in Madison, Tennessee. The Defendant was employed as a salesman by the Castner-Knott department store in downtown Nashville and also worked at a downtown hotel. Amy and the Defendant had some contact with each other, and she stayed at his residence at least once. She renewed her filing for a divorce in June or July.

The Defendant alternatively was angry with Amy, then made attempts to reconcile and was apologetic. He would talk with Don and Lou Beasley and ask them to "please straighten her out." He asked them to help him get her back. The Beasleys refrained from involvement and told the Defendant that the relationship problems were to be solved between him and Amy. However, the

Defendant blamed the Beasleys, and Don Beasley in particular, for meddling in his relationship with Amy and turning her against him. Lou Beasley denied that the Defendant's being black and Amy's being white was a problem.

The Defendant began to call Amy more frequently during the time shortly before the murder, which occurred on September 28, 1995. He called her at work and at home, sometimes eight times a day, in an attempt to win her back. He frequently blamed her father and stated that he should "stay out of it." The Defendant referred to Don Beasley in approximately half of the conversations between him and Amy. Amy continued to allow visitation between the Defendant and their daughter, Savannah. They usually met at a park or a restaurant.

Amy moved from her parents home to an apartment in Antioch, Tennessee, approximately a week before Don Beasley's murder. The Defendant came to the Beasleys' home in Franklin the day before she moved and helped Amy strip furniture. He also helped her move to the apartment the next day. On Tuesday, September 26, the Defendant showed up at Amy's apartment at approximately 6:00 or 7:00 p.m. He was visibly angry and wanted to move in. Amy refused his demand. This was the last time she saw the Defendant before her father's death.

The Defendant also discussed his marital problems with his coworkers at Castner-Knott. Sam McCullough worked with the Defendant and stated that the Defendant complained that his in-laws were meddling and caused his marital

problems. He appeared agitated and angry. The Defendant stated that he wanted to kill Don Beasley. McCullough saw the Defendant at Castner-Knott on Thursday, September 28, 1995, the day of the murder. The Defendant cashed a check there and looked stressed. He also saw the Defendant walking in downtown Nashville the day after the murder. Paul Francis also talked with the Defendant at work. Francis stated that the Defendant wanted to move into the apartment with Amy and that she would not allow it. He was very unhappy and agitated.

Between 3:00 and 4:00 p.m. on the afternoon of the murder, the Defendant received a check from the Hermitage Hotel and cashed it at Castner-Knott. He bought a six-pack of beer and drank some of it. The Defendant caught a taxi at the Nashville bus station and directed the driver to take him to Franklin. He was dropped off at the main Franklin exit off Interstate 65. The Defendant walked to the Atlas car rental agency and received assistance in calling a taxi. He held a slip of paper. He did not appear to be intoxicated. Taxi driver William Northern picked up the Defendant at 5:30 p.m. The Defendant pointed towards the location. On the paper he was holding was written "213 Pippin Hollow Court." Northern and the Defendant drove around looking for the address. They stopped at a pay phone, Northern suggested calling the police to find the address and gave the Defendant the phone number. The Defendant dialed, then handed the phone to Northern, who heard a "wrong number" message. After calling information and looking at the taxi driver's map, they concluded that the street was "Tippett." They drove to that location. The Defendant instructed the driver

to turn around in the cul-de-sac at which the Beasley's house was located and stop near some trees so he could stash his beer in the woods. The Defendant did not appear intoxicated and Northern did not see him drink, but he did seem somewhat disoriented.

A neighbor, Mike Marlin, saw the Defendant arrive in the taxi, alight, and head towards the Beasley residence. He appeared to be holding a grocery sack as if it held a heavy object. The Defendant walked quickly with his head down. Neither Don nor Lou Beasley were at home. Don had attended a seminar in Nashville in the morning and took Amy to the hospital in the afternoon. He left Amy there, and he and Savannah, who was approximately two-and-a-half years old, returned to Franklin in Amy's car. Lou Beasley saw him arrive at the church at approximately 7:10 or 7:15 p.m. and noted that he stayed approximately twenty minutes.

Meanwhile, the Defendant broke into the Beasley home through the side door to the garage. He stated that he broke the window with a brick and unlocked the door, yet the evidence suggests that the window was pried open with an object. The Defendant sat in the house for awhile and drank some beer. A cigarette butt of the brand the Defendant smokes was also found in an upstairs bedroom. He heard Don Beasley return with Savannah. The Defendant moved from a chair downstairs and went upstairs. Savannah was "fussing, crying and hollering" and Beasley was "picking" at her, or teasing her. The Defendant came down from the upstairs into the kitchen and confronted Don Beasley, who told the

Defendant to take the child. Savannah took her blanket and went upstairs. The Defendant stated that he "snapped" and stabbed Beasley with scissors he got from a kitchen drawer.

The Defendant dragged Beasley's body from the kitchen down a small flight of steps into the garage and covered him with a sheet he found there. He left in Amy's red Honda. At first, he took the wrong exit onto Interstate 65 and was heading south. He turned around and drove back to Nashville. He tossed out the scissors while driving on the highway near some construction equipment.

Lou Beasley returned to the house at approximately 9:45 p.m. She opened the garage to park her car and noticed an object blocking the parking space. She recognized her husband's tennis shoes, and lifted the sheet and saw his body. She ran to use the phone, but there was no service. She then ran to a neighbor's house, called 911, and had the neighbor look for Savannah, who was found asleep in an upstairs room. Lou Beasley later discovered that the telephone wires in the kitchen and the upstairs bedroom had been cut.

Emergency personnel, officers, and detectives with the Franklin Police Department arrived at the scene of the murder. The victim, Don Beasley, was lying, face up, in the garage. The victim's chest was covered in blood. His right arm was bent behind his back in a awkward position. After detectives spoke with Lou Beasley, the Defendant became the primary suspect for the killing. Numerous blood samples were taken from the garage floor, the stair railing, the

door to the garage, and the kitchen. A pair of cotton work gloves, with what appeared to be a blood stain, was collected. It appeared that the side door to the garage had been pried open. The window in the door had two layers of glass. The outside glass was broken, but the inside was not. The metal frame of the inner window was pried open.

Later that night, at approximately 2:00 a.m., the Defendant's roommate in Madison saw him come in the apartment in to get his coat. After he left, the Defendant appeared to stagger as he walked through the complex parking lot. In the Defendant's statement, he claimed that he was drinking heavily and went to the Classic Cat, an exotic dancer club. He also claimed that he walked to Madison to get his coat, returned to Nashville, and slept at the construction site for a new stadium.

The Defendant was arrested in downtown Nashville the day after the killing. He attempted to run away when he saw a police officer approaching him, but stopped when he saw a second officer. While the Defendant was being held in Nashville, he was interrogated by detectives from Davidson County and Williamson County. The Defendant waived his Miranda rights and answered their questions, implicating himself as Don Beasley's killer. The Defendant led the detectives to the location where he left the red Honda. The Defendant had stated that he threw the keys on a building. They were not recovered. The Detectives confiscated the Defendant's shirt, pants, socks and shoes for testing at the forensic laboratory. They also found an envelope and a napkin in the

Defendant's back pocket, which were collected as evidence. The scissors used in the murder were not found.

Dr. Charles Harlan was the medical examiner who conducted the forensic examination of the victim. He determined the cause of death to be "multiple stab wounds to the chest." Dr Harlan counted a total of twenty-four stab wounds. There were four stab wounds to the back. He noted that ten of the wounds were of significance. Those wounds perforated both lungs and severed the pulmonary artery. The resulting blood loss into the chest cavity caused the death of the victim. Dr. Harlan also noted abrasions on the upper body and face, indicating that the body was rubbed over a firm rough surface. There were multiple lacerations to the hands and on his arm that appeared to be defensive wounds. The victim's humerus in his right arm had a compound fracture that was incurred before death. Dr. Harlan estimated that death occurred approximately ten to fifteen minutes after the significant wounds were inflicted.

The various blood samples taken from the Beasley residence were tested to determine whether they consisted of human blood. In addition, blood samples were taken from Don Beasley and the Defendant. Testing revealed that the samples from the garage floor, the stair handrail and the door frame were human blood. Human blood was detected on the cotton work gloves, the napkin from the Defendant's pocket, and the Defendant's pants and shirt. Certain blood samples were transferred to the TBI's DNA testing laboratory for further analysis. DNA analysis indicated that the victim's blood matched the samples from the

napkin, the swabs taken from the garage, and the Defendant's pants in a four-probe match. The probability of a match at that level was one in twenty-four point seven million. A three-probe match was indicated on the Defendant's shirt, with a one in two million probability of matching the victim's blood. The Defendant's blood matched none of the samples.

I.

As his first issue, the Defendant contends that the evidence was insufficient to support a verdict of guilt for first-degree intentional murder. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate

view of the evidence and all inferences therefrom.  Cabbage, 571 S.W.2d at 835.

Because a verdict of guilt removes the presumption of innocence and replaces

it with a presumption of guilt, the accused has the burden in this court of

illustrating why the evidence is insufficient to support the verdict returned by the

trier of fact.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493

S.W.2d at 476.


The killing of Donald Beasley took place on September 28, 1995.  The

applicable first degree murder statute was amended, effective July 1, 1995, and

states the following:

> (a) First degree murder is:
> (1) A premeditated and intentional killing of another;
> . . .
> (d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.


An intentional act is statutorily defined:  "Intentional" refers to a person who acts

intentionally with respect to the nature of the conduct or to a result of the conduct

when it is the person's conscious objective or desire to engage in the conduct or

cause the result.  Tenn. Code Ann. § 39-11-302(a).


In the case sub judice, the Defendant broke into the Beasley home and

concealed himself in the upstairs of the home for over an hour before Don

Beasley returned. A cigarette butt of the type of cigarette the Defendant smokes was found in an upstairs bedroom, and the Defendant admitted in his confession that he waited in the home for over an hour. The cords to two telephones in the house were cut cleanly and in hidden locations where it was not immediately apparent that they had been cut.

The Defendant asserted in his statement that he went to the Beasley home just to talk, yet circumstances surrounding the offense suggest otherwise. The Defendant openly expressed hostility towards Don Beasley. Amy Beasley testified that the Defendant stated her father should "stay out" of their relationship. Shortly before the murder, the Defendant called sometimes eight times daily, and he referred to Don Beasley in half of those conversations. The Defendant's coworker, Sam McCullough, talked with the Defendant, who made it clear that he disliked his father-in-law. The Defendant told McCullough that his in-laws were meddling in his marriage and that he would like to kill Don Beasley.

The Defendant claimed that he went to talk to the Beasleys. Yet, rather than telephoning them, the Defendant took a taxi from Nashville to Franklin to go to their house. He caught another taxi in Franklin and told the driver that his car broke down on the interstate. They spent time searching for the Beasley residence, taking several wrong turns. When they reached the correct street, the Defendant directed the driver to let him out of the taxi not in front of the house, but down the street. He told the driver that he had to hide his bag with beer in some woods. However, the neighbor Mike Marlin, who was standing in his front

yard, saw the Defendant walking toward the Beasleys with a paper bag under his arm.

When Don Beasley returned home, the Defendant confronted him, which culminated in Beasley's death. The Defendant inflicted twenty-four stab wounds on the victim, plus numerous defensive wounds. The victim's arm was broken as well. The Defendant dragged the victim into the garage and attempted to conceal him with a sheet. The Defendant fled the scene in Amy Beasley's car and drove back to Nashville. When police spotted him, the Defendant tried to run from the officers, but was apprehended.

After careful consideration of the evidence in the record, we cannot conclude that it was insufficient to support the jury's finding that the Defendant both premeditated and intended to kill Don Beasley. The Defendant stabbed the victim repeatedly in the chest area. This is certainly sufficient to demonstrate that he intended to kill the victim. There is also sufficient evidence to show that the intent to kill was formed prior to the act itself. The Defendant claimed that he "snapped" when he heard Don Beasley "picking" at his daughter. Yet, other evidence suggests that the Defendant planned the killing. The Defendant had expressed his dislike for and desire to kill the victim. Instead of waiting outside the Beasley residence, the Defendant broke into the home and secreted himself upstairs. The telephone lines were cut. The Defendant armed himself with scissors which were clearly capable of being used as a deadly weapon. We note that the predecessor statute for first degree murder required that the perpetrator

deliberate with a cool, dispassionate intent to kill. See Tenn. Code Ann. § 39-13-202(1991); State v. Brown, 836 S.W.2d 530 (Tenn. 1992); State v. West, 844 S.W.2d 144 (Tenn.1992). Subsequently, this provision was amended and deleted the deliberation requirement. The current section reflects that "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d) (1997).

The Defendant denied that he had any intent to kill the victim until after he confronted Don Beasley. He asserts that he just snapped and that he got the scissors out of a drawer after Beasley had seen him and that "I guess I just stabbed him." However, considering the evidence in the light most favorable to the State, the jury could have reasonably concluded that the Defendant intentionally and with premeditation killed the victim.

II.

Next, the Defendant contends that the evidence was insufficient to convict him of aggravated burglary. In particular, he argues that the State did not establish the requisite intent to commit an assault when the Defendant entered the Beasley residence.

According to Tennessee Code Annotated section 39-14-403, a person commits aggravated burglary when he or she commits burglary of a habitation as defined in Tennessee Code Annotates sections 39-14-401 and 39-14-402. A "habitation" is defined as "any structure, including buildings, mobile homes, trailers and tents, which is designed or adapted for the overnight accommodation of persons." Tenn. Code Ann. § 39-14-401(1)(A). "A person commits burglary who, without the effective consent of the property owner enters a building, other than a habitation (or any portion thereof) not open to the public, *with intent to commit a felony, theft or assault* . . . ." Tenn. Code Ann. § 39-14-402(a)(1) (emphasis added).

The Defendant charges that he went to the Beasley residence only to talk. Yet, a jury may infer a defendant's specific intent from the surrounding facts and circumstances. State v. Roberts, 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996).; State v. Chrisman, 885 S.W.2d 834, 837 (Tenn. Crim. App. 1982). A defendant's "declared purpose is but one factor in ascertaining whether his entry was with felonious intent." State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Indeed, one's actions are circumstantial evidence of his or her intent. Id.; State v. Barker, 642 S.W.2d 735, 737 (Tenn. Crim. App. 1982).

Here, although the Defendant stated that his purpose was just to talk, he chose to break the garage window surreptitiously and enter the home. The Defendant cut the telephone wires, which would prevent someone from calling for help. One intending merely to talk would have little need to restrict the ability

of his companions to use the telephone. Furthermore, when the Defendant heard Don and Savannah come home, he hid upstairs and listened. The Defendant then came downstairs, confronted Don Beasley, and, by the Defendant's own admission, proceeded to stab him. The medical examiner noted four stab wounds in the victim's back. Beyond this, Beasley's arm was broken with a compound fracture and was bent behind his back. On this record, we believe that the jury had more than ample evidence with which to infer that the Defendant intended to commit an assault upon the victim when he entered the home. Therefore, we conclude that this issue is without merit.

III.

In his third issue, the Defendant argues that the jury erred by imposing a sentence of life without parole. The State did not seek the death penalty in this case, leaving as available sentences either life without the possibility of parole or life imprisonment with the possibility of parole after twenty-five years. See Tenn. Code Ann. §§ 39-13-302; 39-13-207. In sentencing when the death penalty is not sought, if the jury unanimously determines that the State has proven one or more aggravating circumstances, they must impose a sentence of life or life without parole. Tenn. Code Ann. § 39-13-207. After a separate sentencing hearing, the jury set the sentence at life without parole.

The State proposed two statutory aggravating circumstances: That "(5) [t]he "murder was especially heinous, atrocious, or cruel in that it involved torture

-16-

or serious physical abuse beyond that necessary to produce death; and that "(7) [t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb." Tenn. Code Ann. § 39-13-204(i)(5),(7). In mitigation, defense counsel presented evidence suggesting that the Defendant suffered from a mental illness and that he was intoxicated at the time the crime was committed. It is unclear from the record or the briefs in what categories of the statutory mitigating circumstances the evidence was accepted. At best, the defense offered evidence to support mitigating factor (2), that the "murder was committed while the defendant was under the influence of extreme mental or emotional disturbance" and/or (9), the catchall mitigating circumstance. Tenn. Code Ann. §§ 39-13-204(j)(2),(9).

The Defendant's primary argument is that the State failed to prove the aggravating circumstances beyond a reasonable doubt as is required by Tennessee Code Annotated section 39-13-207(c). We disagree. Regarding the heinous, atrocious and cruel circumstance, there was clearly sufficient evidence to support the finding of this aggravator. The Defendant stabbed the victim twenty-four times. Dr. Charles Harlan testified that the victim would have felt severe pain and that it took upwards of ten to fifteen minutes to die. See State v. Smith, 868 S.W.2d 561, 580 (Tenn. 1993). There is evidence of numerous

defensive wounds, suggesting that the victim was aware of and attempting to protect himself against the onslaught.   See  State v. Sutton, 761 S.W.2d 763, 767 (Tenn. 1988); State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982).   In addition, the victim's humerus was broken in a compound fracture prior to his death. This also demonstrates that the Defendant inflicted torture upon the victim in a cruel and vicious fashion.  See State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996).

Furthermore, we find that the evidence also supports the imposition of aggravating circumstance (7).  The murder was knowingly committed while the Defendant had a substantial role in committing an aggravated burglary.  We have already concluded that the evidence was sufficient to support the jury's verdict of guilt for aggravated burglary.  The Defendant was the only participant in the burglary or the murder.  Therefore, we can only conclude that the jury did not err in applying this statutory aggravating circumstance.

Finally, it was incumbent upon the jury to "weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances." Tenn. Code Ann. § 39-13-207(d).  The determination of whether the sentence is life or life without parole is made with the jury's "considered discretion." Tenn. Code Ann. § 39-13-207(c).   Apparently, the jury considered the evidence and determined that the aggravating circumstances outweighed the mitigating circumstances in setting the sentence at life without parole.  We cannot reweigh

-18-

or reevaluate the evidence considered by the jury.  Therefore, we can only conclude that the jury properly imposed the sentence of life without the possibility of parole.

IV.

As his fourth issue, the Defendant charges that the trial court erred in imposing the maximum six-year sentence for his conviction for aggravated burglary. When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and

-20-

that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Defendant was convicted of aggravated burglary, a Class C felony. Tenn. Code Ann. § 39-14-403(b). A fine was set by the jury at $10,000.00.  The Defendant was sentenced as a standard, Range I offender and the trial judge suspended the fine. The possible Range I terms of imprisonment for a Class C felony are three to six years with a release eligibility date at thirty percent.  Tenn. Code Ann. § 40-35-101.

At the conclusion of the sentencing hearing the trial court, in setting the Defendant's sentence at the maximum within the range, found four enhancement factors and no mitigating factors.  The Defendant argues that the trial court should have found, as mitigating factors, that the Defendant has a favorable work history and that he had graduated from high school and obtained postgraduate training in industrial/graphic arts.  Neither of these factors are statutory mitigating factors, yet would fall most appropriately under the catchall provision (13). Tenn. Code Ann. § 40-35-113(13).  We agree that these factors could be considered in mitigation, but we do no believe that these mitigating factors are entitled to great weight.  On this record, we cannot conclude that the trial judge erred or abused his discretion in imposing the maximum sentence of six years for this offense.

V.

As his final issue, the Defendant contends that the trial court erred by ordering him to serve his sentence for the aggravated burglary consecutively to the sentence of life without parole. The trial court found that the Defendant was a dangerous offender, which requires that an offender's "behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Beyond this, it must be shown that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); see State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987); Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976).

The trial court found that the Defendant was a dangerous offender and we agree. Tenn. Code Ann. § 40-35-115(4). He had no hesitation about committing a crime in which the risk to human life was high. The circumstances surrounding the offenses were aggravated in every respect. Furthermore, the trial court found, considering the principles enumerated in Wilkerson, that the sentences reasonably related to the severity of the offenses and that an extended period of incarceration was necessary to protect the public. In support of this determination, the trial court stated that although the Defendant had already been sentenced to life without the possibility of parole, the potential outcome on appeal or future changes in the laws regarding parole may affect the ultimate disposition of the Defendant's sentence. We do not, however, believe that a present

sentencing determination should be predicated upon speculations about future changes in the sentencing laws.

The Defendant has already been sentenced to life without the possibility of parole, which is the most severe sentence available short of capital punishment. We recognize that the attack inflicted upon the victim, Don Beasley, was extremely vicious and grisly. Certainly, no possible punishment can be too severe to relate reasonably to the harm suffered by the victim's family. Yet, the Defendant has already been sentenced to spend the remainder of his life in prison and adding six additional years for the aggravated burglary seems meaningless under our law. A sentence for life without parole means that he "shall *never* be eligible for release on parole." Tenn. Code Ann. § 39-13-204(e)(2) (emphasis added). We must evaluate sentencing decisions based on the laws enacted by the legislature which exist today and, as it stands, a consecutive sentence would not serve the purpose of protecting the public against further criminal conduct for a defendant who has already been sentenced to life without the possibility of parole. Therefore, although our action may be meaningless, we modify the sentence for aggravated burglary to be served concurrently with the existing sentence for the first degree murder conviction.

The six-year sentence for aggravated burglary shall be served concurrently with the sentence of life without the possibility of parole. In all other respects, the judgment of the trial court is affirmed.

-24-

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE


_____
JOSEPH M. TIPTON, JUDGE